[S. F. No. 4814. In Bank.—February 4, 1910.]

## CHARLES MILLER, Respondent, v. BAY CITIES WATER COMPANY (a Corporation), et al., Appellants.

WATER-RIGHTS—INJUNCTION—DIVERSION OF UNDERGROUND FLOW OF STREAM—SUPPORT OF FINDINGS.—In this action to enjoin the diversion by defendant of the water of a stream which flows in underground strata to the well of the plaintiff, and the flow of which is essential to supply plaintiff with water for the irrigation of his orchard, it is held that the findings for the plaintiff have ample support in the evidence, and sustain the perpetual injunction granted by the decree.

ID.—WIDTH OF WATER SUPPLY—OTHER WELLS.—While this controversy concerns only the plaintiff and the defendants, and must be disposed of according to their respective rights, yet as bearing upon the correctness of the findings as to plaintiff's source of supply this court may consider the evidence showing that the underground water channels underlie several square miles of territory in the Santa Clara Valley and are connected with other wells in vast gravel beds extending for miles northerly of the gorge which forms the point of diversion by the defendants, and that these wide strata are all affected by the flow of the underground waters in proportion to their volume.

ID.—FLOW OF WATER UNDER PRESSURE IMMATERIAL—FLOW AS PART OF LAND.—While the evidence in fact sustains the finding that the flow of water to plaintiff's well was under pressure, yet that fact is

immaterial in determining plaintiff's legal rights. The right of a person owning land upon a channel of underground water is not measured by whether the water is under pressure, but by considering whether the waters came to him in a natural defined flow so as to constitute a parcel of his lands.

Id.—Source of Supply Immaterial.—While the evidence shows clearly that one single river enters the region in which plaintiff's land is situated, yet it is of no real consequence what is the source of supply coming to the plaintiff's well and many other wells throughout the valley, since the evidence shows clearly that plaintiff needs all the water that comes through the gravel channel to his well, from whatever source derived, and defendants cannot deprive him of any water to which he is entitled as against them by reason of its natural flow to his stratum.

Id.—Intention of Defendants to Divert Water.—Considering all the facts in evidence bearing on the intention of defendants to divert the waters, it is held that the court was warranted in finding that it was the defendants' intention, unless restrained by the court, to divert all of the waters of the river, both surface and subsurface, and that, so far as their acts disclose, they intended to do so by the means and methods which the court found were being employed or contemplated by them.

Id.—Failure to Find—Alleged Intention to Divert only Flood Waters—Absence of Evidence.—The failure to find upon an allegation in the answer as to defendant's intention to divert only such portion of the storm or flood waters which for a portion of the year rushed down the channel of the river to the bay of San Francisco and were wasted and lost therein is immaterial, where no evidence was introduced by the defendants in support of this allegation.

Id.—Rights of Owners of Flow in Flood Waters—Burden of Proof as to Surplus.—While the owner of the underground flow is only entitled to the flow of the flood waters to the extent that they may replenish his water-bearing stratum, still his rights to the accustomed flood flow of the stream for that purpose is paramount to that of an appropriator to divert any of the waters for use beyond the watershed. If the accustomed flow is more than is needed to supply the underground flow, the burden of proof was upon the defendants seeking to appropriate any surplus water, to prove that there is a surplus which would be wasted and lost if not appropriated.

Id.—Findings—Rights of Subsurface Owners in Storm Waters.—The findings supported by the evidence clearly establish the rights of the subsurface well-owners in so much of the storm waters as is required to serve the necessary purpose of adequately supplying the subsurface flow of waters in the gravel beds underlying the Santa Clara Valley, including the storation thereof necessary to supply plaintiff's well with an adequate and constant flow of water thereto.

Id.—Rights of Claimants of Percolating Waters—Common-Law Rule Modified.—In this state, in view of its climatic conditions

CLVII Cal.—17

and the necessity of irrigation of arid and semi-arid lands, the common-law rule as to percolating waters based on the doctrine of *cujus est solum* has been modified so as to apply the more reasonable doctrine of *sic utere tuo,* etc.

ID.—MODIFIED RULE NOT CONFINED TO CORRELATIVE RIGHTS—PROTECTION OF RIGHTS IN PERCOLATING WATERS.—Where no riparian rights are involved, the modified rule is not confined merely to the protection of the correlative rights of users of percolating waters as between themselves, but those rights must be protected against any diversion thereof by a subsequent appropriator of the stream above, which impairs or destroys vested rights in percolating waters.

ID.—PERCOLATING RIGHTS PROTECTED BY RULE OF "REASONABLE USE"—INJURIOUS DIVERSION.—The same principle which protects riparian owners by the rule of reasonable use, and precludes any injurious diversion of the stream above them, applies to the protection of the owners of percolating waters which are part of their land, by the same rule of "reasonable use," and should equally protect them from any injurious diversion above which interferes with the natural advantages enjoyed by them in such use.

ID.—RIGHT TO RESTRAIN DIVERSION BEYOND WATERSHED.—The owners of percolating waters have the same natural right as riparian owners to restrain any attempted diversion of the surface flow of the stream beyond the watershed, so as to impair or destroy their rights to the use of the waters for the irrigation of their lands, to which they are entitled as owners thereof, whether the irrigation be by artesian wells in the subsurface flow, or by use of the surface flow.

ID.—DIVERSION OF SURPLUS FLOW.—Though an appropriator may divert a surplus flow, when it manifestly can serve no useful purpose in supplying the underground artesian wells, including that of plaintiff in the subsurface flow, yet he cannot so divert storm or flood waters, as such, which serve a useful purpose in supplying the artesian flow.

ID.—PROPER PLACE FOR DETERMINING SURPLUS—APPROPRIATION.—The only place where a surplus flow of water in any year could properly manifest itself is below the artesian belt, when surplus water therefrom flows into the bay, at which place the surplus could be appropriated without injury to any one, yet it appears that the surplus flow is only occasional, and may not exist at all in any given year. It is manifest that the gorge is not the proper place for appropriating surplus water by diverting the whole water of the stream, upon the flow of which past the gorge the whole flow of percolating water in the artesian belt is absolutely dependent.

ID.—DECREE ENJOINING USE OF APPLIANCES AT GORGE—PLAINTIFF NOT ESTOPPED.—The decree enjoining the use of a shaft, pump, and appliances constructed at the gorge was proper when it manifestly appeared that the use of the same would deprive the plaintiff of his rights. The plaintiff is not estopped to maintain his action to enjoin

the use of the same, after their construction, where it was brought as soon as it reasonably appeared that the proposed diversion by means thereof would injuriously affect the supply of water in plaintiff's artesian stratum.

ID.—PROPOSED MODIFICATION OF DECREE—ABSENCE OF PLEADING OR EVIDENCE.—The contention of appellants that the decree should be so modified as to permit them to store the waters of the watershed in reservoirs, and to require them in each season to supply the stream with a specific quantity of water for use in the artesian belt, on the theory that they would thereby appropriate the surplus water, whatever other objections there may be thereto, cannot be sustained when there is nothing in the pleadings remotely suggesting such decree, and no evidence was given in relation thereto.

ID.—APPELLANTS ESTOPPED TO CLAIM MODIFICATION.—As appellants did not assert any right to impound the storm waters and release them in any given quantity below the gorge, so as to supply plaintiff's and the other artesian strata, but asserted that plaintiff had no right to any of these waters, but that appellants had a perfect right to divert and use them all, they cannot be heard to complain that the court did not embrace in its decree a plan which they had never asserted a specific right to, or asked to be made.

APPEAL from a judgment of the Superior Court of Santa Clara County and from an order denying a new trial. A. L. Rhodes, Judge.

The facts are stated in the opinion of the court.

Garret W. McEnerney, Walter Rothchild, and John Garber, for Appellants.

S. F. Leib, for Respondent.

LORIGAN, J.—Plaintiff, the owner of a tract of land in Santa Clara County upon which was planted an orchard of twenty-one acres of deciduous trees, brought this action against the defendant, a California corporation, organized for the purpose of furnishing water to cities and their inhabitants, and against certain of its officers, to enjoin the diversion by them of any waters of the Coyote River in said county; either those waters flowing on the surface of the bed of said river or flowing or percolating underneath it, or from diverting any of said waters to any extent.

As the basis of his right to an injunction it was alleged in the complaint, among other things, that beneath the land

of plaintiff and under a stratum of impervious clay there
is a stratum of gravel always full of water under pressure,
which water was constantly supplied to said stratum from
the sinking and subsurface flow of the Coyote River; that
from a well sunk in the said water-bearing stratum plain-
tiff had for years annually irrigated his orchard which was
of great value; that if defendants were permitted to divert the
waters of the Coyote River, as they threatened to do, above or
at a certain gorge known as the "lower gorge" of the river,
the gravel stratum of plaintiff and his well would be deprived
of water from which to irrigate his orchard and the orchard
would be irreparably damaged and soon become of little or no
value. The answer denied all the material allegations of the
complaint and particularly denied the existence of any gravel
stratum under the land of plaintiff, connected with or sup-
plied from the waters of the Coyote River, and further denied
that defendants intended to divert any surface or subsurface
waters of the river or any waters at or above said lower gorge
except a large portion of the waters of the river which sunk
at that point and became impounded and stored in the gravels
deposited therein and did not flow at all, and except, further,
that they intended to divert "a portion of the storm or flood
waters which for a short period in every year rush in great
volume and with great velocity down the channel of said river
to the bay of San Francisco and are wasted and lost therein."

Plaintiff had a decree as prayed for and defendants appeal
therefrom and also from an order denying their motion for a
new trial.

Upon the issues presented under the pleadings the trial
court found the following facts: That underneath the surface
of the land of plaintiff known as the "Miller Ranch," which
is about four miles northerly from what is known as the lower
gorge of the Coyote River, and underneath a stratum of im-
pervious clay there is a stratum of coarse, loose gravel seven
feet thick, being from eighty-three feet to ninety feet below
such surface, which is always full of water, under pressure,
the same being constantly supplied to said stratum of gravel
from the sinking and subsurface flow of the waters of the
Coyote River, as hereinafter stated. Said stratum of gravel
extends from plaintiff's land southerly and approaches the
surface of the ground and connects with, and is a part of,

the gravel bed of the Coyote River, just below and in said lower gorge of said river. The plaintiff for years past has had a well on said land extending down into said stratum of gravel, through which he has pumped the water therefrom upon his land, and irrigated his orchard, and, if unable to do so, his orchard and land will be irreparably injured. The Coyote River rises to the eastward of the Santa Clara Valley, in that portion of the Coast Range Mountains known as the Mount Hamilton Range. It is formed by the union of a number of smaller streams which rise and have their confluence south of Mt. Hamilton, and thence issues in the single stream of the Coyote River into the Santa Clara Valley, through a narrow gorge, known as the "upper gorge," about twenty miles south of the city of San Jose, and thence flows northerly along the eastern edge of the Santa Clara Valley about eight miles to the point where the valley narrows to what is known as the "lower gorge," which lies about twelve miles south of the city of San Jose. The channel of the river passes through this lower gorge and extends thence northward about twenty miles to the San Francisco Bay. The Coyote River has a watershed in that portion of the Mount Hamilton Range wherein it rises of over two hundred square miles, and supplies by far the greater portion of the underground or artesian waters of all that part of the Santa Clara Valley which lies northerly of the lower gorge, and all the rain falling upon the watershed drains into the Coyote River before it enters the Santa Clara Valley at the upper gorge. During a few days in times of freshets or high waters, much of the waters of said river run in its bed from the upper gorge to the bay of San Francisco; but during some seasons, freshets or high waters occur only to a limited extent, and in other seasons they do not occur at all; and at all times, whether they do or do not occur, a large portion of the waters of the river and, during the rainless months, substantially all thereof, sinks into said gravel stratum during its course to at least as far northerly as the city of San Jose, and flows or percolates through the said gravel stratum and other gravel strata connected therewith, from and just below said lower gorge, to at least as far northerly as the bay of San Francisco. Said waters keep said gravel stratum, and said other gravel strata connected therewith, full of water and under pressure, and the same rise up in plaintiff's

said well from fifty-five to sixty-three feet above said stratum, the variation depending mainly upon the time of the year and also upon the flow of water in the river; and said waters rise up in all the other wells which have been bored down to the said gravel strata connecting therewith. Between San Jose and the bay of San Francisco, such pressure causes the water in said gravel stratum and the gravel strata connecting therewith to actually overflow from the wells connected therewith in large quantities, making what is usually designated "flowing artesian wells." The largest of said flowing artesian wells are those nearest the bay of San Francisco, the waters in said gravel stratum and gravel strata connecting therewith, which furnish water for said last-named wells, being at a lower level below the level of said gorge and under greater pressure from said waters so sinking in said stratum at said gorge than are the waters in said gravel stratum and strata at points further south from said bay of San Francisco. At the lower gorge, Santa Clara Valley is only about four hundred yards wide, and consists almost entirely of the gravel bed of the Coyote River; and said gravel bed of said river there extends through the lower gorge between the hills at that point, and extends down to the bedrock, lying from thirty-five to one hundred and sixty-five feet below the surface of the gravel through such gorge; and on the surface of the gravel bed of said river, or underneath through the gravel bed thereof, all the waters of said river and of said watershed flow and percolate in a northerly direction; and all of said waters flowed or percolated through said gravel bed, underneath the surface thereof, at the date of commencing this action.

It is further found that at the time this action was commenced—January 9, 1904—defendant had sunk a shaft in the gravel bed of the Coyote River at the lower gorge and was then installing powerful machinery and pumps and intended therewith and by other means to divert substantially all of the surface and subsurface water of the river amounting to some twenty million gallons per day or more, prevent these waters from passing over said lower gorge northward, and carry them by pipes and other means from said point of diversion to other points and sell the same as an article of merchandise, thus preventing them from returning to the river and supplying water to the gravel stratum in the land

of plaintiff, which stratum, if they were so diverted by defendants, would be without sufficient water to enable plaintiff to irrigate his orchard or land; that defendant corporation also intended to divert during a portion of each year a large portion of the surface waters of the Coyote River at points on the river before and after it emerged from the Mount Hamilton Range at the upper gorge and above said lower gorge and divert the same to other points for sale and prevent any portion of the water from returning to the river or gravel bed thereof, and, generally, that the defendant corporation unless restrained threatened to divert and carry the waters of the river beyond their own lands for sale as merchandise, prevent them from returning to the river or gravel bed, with the result that any or all of these threatened and intended diversions would prevent these waters from flowing or percolating into the gravel stratum northerly of the lower gorge, and prevent plaintiff from having any water in his well with which to irrigate his orchard, and so cause irreparable damage to the same.   Continuing, it is found that no material part of the waters underneath the land of plaintiff are supplied from any source other than the waters which fall upon the watershed of the Coyote River.   The point where said river emerges at the upper gorge from said range of mountains into the side of the Santa Clara Valley is about eight miles southeast from said lower gorge, and is over one hundred feet higher than the lower gorge.   Between these two points is that portion of said valley which is designated by the defendants in their answer as being known as the "Coyote Valley."   This Coyote Valley has therein very large strata of gravel, extending and descending continuously from the bed of the river at the upper gorge to the gravel in the river at the lower gorge.   At the lower gorge the gravel extends from surface to bedrock, which, at its deepest point, is one hundred and sixty-five feet deep.   Through these gravels at the lower gorge flow about twenty million gallons per day, a little more in the wet part of the year and a little less in the dry part of the year.   The flow is supplied mainly from the said gravels of said "Coyote Valley"; and those gravels are in turn constantly, but chiefly in the wet part of the year, supplied by the waters of said river after it emerges into said valley at the upper gorge.   The waters of these very large strata of gravel in said "Coyote Valley" slowly

flow northward to said lower gorge, and through the same, and on down toward the bay, through said underground gravel strata, north of said lower gorge; and would soon, within two years at most, all flow through said gravels in said lower gorge, if they should receive no further supply from said river. No water is stored or impounded in the said gravels in said "Coyote Valley"; but though said gravels impede the flow of the water therein, it flows constantly and continuously through them and through the gravels in said lower gorge and thence through said gravel strata north of said gorge. The defendants threatened and intended to build a dam across said lower gorge, with the bottom resting on bedrock, and extending to the surface of the gravel. This dam, if built, would effectually prevent any of the waters heretofore flowing through said gravels of said gorge from thereafter flowing or passing through the same. If defendants pump and extract no more water out of the gravels of said gorge than their present shafts, tunnels, pumps, and appliances now permit, still, if such amount of water as could now thereby be pumped were pumped, the plane of the waters in the gravels below said gorge would be thereby lowered to such an extent that the same would be entirely below the bottom of said gravel stratum in plaintiff's lands, and plaintiff's said well would be thereby entirely deprived of water. Soon after heavy rains upon the watershed of the river, portions of the storm or flood waters of the river flow in its channel to the bay, for short periods of a few hours to a few days—the lengths of the periods being dependent upon the heaviness of the rainfall. Large portions of the storm waters flowing in the channel of the river sink into the gravel strata in and along the bed and banks of the channel. The volume of the storm waters flowing in the channel decreases, from a point, near the upper gorge, to a point near the northern limits of San Jose; and from the latter point to the bay the volume of the waters increases in case of very heavy rains or of frequent heavy rains during any winter. A larger volume of storm waters sinks in the gravel strata in and along that part of the channel at or near the lower gorge, of the length of about two miles, than in the gravel strata in and along any other part of the channel. The waters, sinking into such gravel strata, flow and percolate into the several gravel strata underlying the surface of the Santa Clara Valley,

and among others the stratum penetrated by the plaintiff's well. The storm waters coming from a very heavy rain, or from frequent heavy rains during the winter, largely increase the flow and percolation of water into the gravel strata underlying the valley, and thereby the water in such strata and the pressure of the water therein are increased, and the water in the wells, including the plaintiff's well, rises, and wells are caused to flow, and flowing wells to increase their flow. Such increase of water, of its pressure, of its rise in and flow from the wells, is proportionate to the volume of storm waters flowing in the channel of the river.

In addition the court found that from the evidence presented in the case it could not "determine with certainty what portion of the storm waters issuing from the upper gorge during any rainy season, or during any rain storm, sinks into the gravel strata underlying the valley; but more than one third of the storm waters flowing during the last six years did so sink. Should those storm waters be prevented from flowing in the channel of the river below the upper gorge, and be diverted to places not within the valley, the gravel strata underlying the valley would be deprived of their usual supply of water, and within a short time—not more than two years—the wells penetrating those strata would not yield enough water for profitable or successful irrigation, and would not yield more water than the surface wells."

The decree entered perpetually enjoined the defendant corporation and its officers from arresting or obstructing at or above the lower gorge, (except for the reasonable use thereof on the lands of the said corporation in the exercise of its riparian rights) any of the water of the Coyote River which, excepting for said arresting or diverting, would flow on the surface of the bed of said river through said gorge, or would flow or percolate through said gorge underneath the surface thereof.

On this appeal practically every finding of the court is challenged as not sustained by the evidence; it is also insisted that the court failed to find on certain material issues and that the decree as made is erroneous for various reasons.

The transcript on appeal consists of some sixteen hundred pages. The various briefs of counsel on both sides have exhaustively discussed the evidence applicable in support of, or

against, the findings made, and by their excerpts therefrom or by ready reference to it in their briefs, have facilitated our examination of it. The limits of a judicial opinion, however, will in many cases preclude a consideration in detail of findings where they are very many and are all questioned, and particularly is this true when, as in this case, a careful examination of all the evidence satisfies us that the findings as made find ample support in it, and a discussion of it could only end in demonstrating that fact. We will, however, refer to the evidence supporting them in a general way, and when we come to consider the attack made on the particular findings of the court as to the threats, intent, and conduct of the defendant respecting the diversion of the waters of the Coyote River will discuss the evidence applying to them more in detail.

There can be no doubt but that it was as clearly proven under the evidence as such matters can be proven that there are underlying a vast territory in the Santa Clara Valley—some twenty miles square—numerous channels created by the Coyote River through its action in ages past when, in the building up and forming of the valley, its waters rushed in enormous quantities from the mountains, changing from one side of the valley to the other, and constantly varying its course in its flow through the lower gorge northward towards the bay of San Francisco. These old channels now lie beneath the surface of the valley at varying depths; channels beside channels, and channels crossing and interconnecting with each other, through each of which the Coyote River once flowed in its open course, but which are now underground channels filled with loose and coarse gravel, through which waters still flow, supplied to them through percolations from the Coyote River, with which these old gravel channels have always been connected, and that the particular underground channel or gravel stratum from which the well of plaintiff is supplied constitutes one of these old channels, which is likewise connected with and supplied from the waters of Coyote River. The intake of all these old channels, including that from which the plaintiff derives his water, is in the enormous bed of gravel extending several miles northerly below the lower gorge. For at least one mile below the lower gorge this deposit consists of pure gravel from surface to bedrock. Into this vast gravel bed during the winter and spring when the storm waters

gather between the upper and lower gorge and discharge them-
selves through the latter, there sink into these gravels im-
mense quantities of water, in amount limited only by the
extent of the rainfall, but in any season of flood extending
largely into hundreds of millions of gallons per day, the
evidence showing when tests were made that these intakes
amounted in some seasons to from three hundred to five hun-
dred million gallons a day during a single storm.  It is quite
clear that these quantities of waters sink into the gravels and
fill up the various branch channels underlying the valley
which connect with these gravels by the pressure of the storm
waters passing over them, and the supply of these under-
ground channels is obtained in no other way; and it is equally
clear that the intake into these gravel beds and the gravel
strata along the flow of the river generally is in proportion
to the height and breadth of the storm waters passing over
them and the consequent pressure they exert to increase the
percolation of the waters in the vast gravel bed and gravel
strata.  That the waters which lie in these old branch chan-
nels are supplied by the percolation of waters into the gravel
beds and strata from the storm waters of the Coyote River
is beyond question from the evidence, as it equally appears
that the flow of these storm waters during the recurring heavy
rains is absolutely necessary to sustain the supply of water
thereto which would otherwise and in a few years be ex-
hausted.  That these underground gravel strata are connected
with the river in these gravel beds at the lower gorge and that
their waters are thus supplied to these branch underground
channels therefrom and that the findings of the court to that
effect are true appears not only from the evidence of the
geological expert—Dr. Branner, whose qualification to testify
on the subject was conceded, and who testified to that effect—
but also from tests made in wells and the testimony of well-
borers and well-owners owning lands over these gravel strata,
and others speaking on the subject.  Of course this supply
from the rainfall and storm waters is augmented by the
twenty million gallons which year in and year out daily per-
colate over the gorge and which is designated as the normal
flow of the river, but it is quite evident that this quantity
of itself, and save for the immense quantities which are sup-
plied by the annual storm waters, would not sufficiently meet

the needs of those hundreds of property-owners whose lands are situated above the various old branch channels, all having their intake into the gravel beds at the lower gorge, and who draw water for their irrigation from wells sunk in these various water-bearing gravel strata. While it is true that this controversy concerns only the plaintiff and defendants and must be disposed of by a consideration of their respective rights, yet, as bearing upon the correctness of the findings of the court as to the source of supply of these waters of plaintiff we have a right to take into consideration the evidence which shows that these various water channels underlying square miles of territory in the Santa Clara Valley all have their intake and ramify from the vast gravel beds extending for miles northerly from the lower gorge; that in instances they connect with each other and that all are affected by the flow of the flood waters in proportion to their volume over the vast gravel beds which serve as an intake for them and supply the various underground branch streams over which these lands are situated. The tests which were made, as well as the evidence of these various well-owners showing that the water in the hundreds of wells in the district in which lands overlie these various channels decreases in depth in the summer time while the irrigation season is active and increases in volume with the winter rains and flood waters and increases in proportion as these floods are frequent and heavy or less frequent or light, and that this was the effect in all wells, including those situated on the channel in which Miller's well was situated, was sufficient of itself to warrant the finding of the court as to the sources from which the waters in the strata underneath Miller's land were supplied.

While it is insisted that the finding that Miller's well was in a stratum of gravel under pressure is not supported by the evidence, yet no good purpose can be subserved by discussing this point. The evidence shows that as a fact the well was sunk in a stratum under pressure as the court found, but whether it was or not can make no difference in Miller's legal rights. The right of a person owning land upon a channel of underground water is not measured by whether the water is under pressure or not, but by considering whether the waters come to him in a natural defined flow so as to constitute a part or parcel of his lands, a matter which will be considered as

we discuss the law applicable to this matter. It is further insisted that the Miller gravel stratum is supplied from other sources than the Coyote stream and that the finding of the court that Miller's supply came from no other source is not supported by the evidence. About the only evidence rising above conjecture which could support this theory is that such waters might be supplied from a watershed of some eight square miles below the gorge. No other stream save the Coyote enters the region in which Miller's underground stratum is located. And comparing this watershed of eight square miles with the Coyote watershed of some two hundred square miles which the evidence does show contributes its waters to supply the Miller stratum and the other underground channels, this would appear to be too trivial to consider as a source of substantial supply. Dr. Branner, the geological expert heretofore referred to, testified that the water supply in Miller's channel all came from the gorge. This would seem to settle the question, but in any event it is a matter of no real consequence as the evidence shows that plaintiff in common with hundreds of others having wells sunk into the same strata and who are being supplied from the same source (each being entitled to take only a reasonable amount) needs all the water which does come to this gravel channel from whatever source and defendants cannot deprive him of any portion which gets to his gravel stratum simply because some of the necessary quantity may come from another source than the Coyote River. As all is needed from whatever source it comes, and comes by natural flow to the stratum, plaintiff is entitled, as against defendants, to it all.

We shall proceed now to a consideration of the claim of appellants that the findings of the court as to the threats, intentions, and conduct of defendants relative to the diversion of the waters of the Coyote River are not sustained by the evidence; and to the further claim of a failure to find on what are asserted to have been material issues, because these matters must be disposed of before any consideration of the legal propositions involved in the controversy can be had.

The court found that the defendants threatened and intended to take and divert, and, unless restrained by the court, would take and divert all the waters of the Coyote River, both surface and subsurface, passing through said lower gorge

and which supplied water to the gravel stratum in which plaintiff had his well and from which he extracted his waters for irrigation, and specified in its findings the means by which the appellants were attempting to accomplish this result. We see no room for questioning the sufficiency of these findings. The appellants had filed a notice of appropriation at the point of intended diversion on the banks of the Coyote River between the upper and lower gorges, claiming the appropriation of "the water of said Coyote River then flowing and to flow therein to the extent of 10,000 inches measured under a four inch pressure," to be diverted through "a canal . . . 120 feet wide upon the bottom and 8 feet deep below banks, or such other dimensions as may be necessary to carry such waters to reservoir sites." In terms this appropriation did not cover flood waters of the river, and, as applied to the waters therein occasioned by ordinary rains, would cover all of those waters and would take all the waters which, after such rains, passed through the lower gorge and into the gravel beds below it. Subsequently another notice was filed appropriating "500,000 inches measured under a four inch pressure." This applied in terms to the flood waters and, as the records show, would, except in one instance, have far exceeded the amount of any flood waters which flowed in the river. This appropriation of such a vast amount was evidently intended, as counsel for appellants state in their brief, to cover the "peak" rate of flow, and necessarily the "peak" rate of flow would embrace the entire flow of any flood waters. In fact, the appellants are now here insisting that they have a right to take and appropriate the flood waters of the river. So much for the surface waters. As far as the subsurface waters of the Coyote Valley are concerned, it is conceded by appellants that they amount approximately to some twenty million gallons per day. Yet that appellants intend to abstract all these waters, and at the commencement of this action were taking means to do so, is quite apparent. They had contracted for pumps to be operated in the gorge, of a combined lifting capacity of twenty million gallons of water a day for the first ninety feet in the gorge; they had sunk a caisson or shaft at the lower gorge with tunnels extending towards its bank on either side and had installed two pumps with a demonstrated capacity, at the least, of raising ten million gallons a day. They

had also bored three strings of wells across the lower gorge to bedrock as "trial dam site lines" with the obvious purpose of constructing a submerged dam from bedrock to the surface of the gravel at the lower gorge and thus prevent the flow of any of this twenty million gallons of water to the gravels through the lower gorge.

Beyond all this, however, and as applying to both surface and subsurface waters, in two letters of the appellants to the board of supervisors of the city and county of San Francisco they offered to deliver sixty-eight million gallons of water per day from the Coyote River at the lower gorge under gravity pressure and to bring the supply up to seventy million gallons per day if necessary. All this they asserted their ability to do by reason of alleged ownership and control of the entire watershed of the Coyote River of three hundred square miles with adequate and desirable reservoir sites, the retaining capacity of these several reservoirs amounting to from fifty thousand to sixty thousand millions of gallons, not including an underground reservoir or cone, (as they claimed) capable of withstanding a daily draft of twenty or more millions of pure filtered water to be augmented, if necessary, by discharging into it waters from the watershed and reservoirs. All these waters were to be concentrated in the lower gorge and by means of power generated by the fall of waters impounded in the mountain reservoirs were to be brought to a sufficient elevation at the lower gorge so that by gravity pressure they could be brought to the southern limits of the city and county of San Francisco.

Taking all of these facts into consideration there is no room for question but that the court was sufficiently warranted in finding that the intention of defendants was to divert, unless restrained by the court, all the waters of the Coyote River, both surface and subsurface, and, as far as their acts disclose, that they intended to do so by the means and methods the court found were being employed or contemplated.

This disposes of the attack on the findings made by the court as far as we deem it necessary to particularly consider them.

Now, as to the claim that the court failed to find upon material issues raised by the answer of defendants, namely, that they did not intend to divert any portion of the surface

waters of the Coyote River "except or other than a portion of
the storm or flood waters which, for a very short period in
every year, rushed in great volumes and with great velocity
down the channel of said river to the bay of San Francisco
and are wasted and lost therein."

It is not clear from this averment what is meant by "storm"
or "flood" waters "wasted and lost in the bay." It is not a
clear allegation that they were anywhere lost and wasted in
the river, which of course is where the appellants intended
to divert them. But assuming that it was; that, in effect, it
amounted to an averment that the waters which appellants
intended, and which they claimed a right to divert, were the
storm waters which were lost and wasted at the point of
diversion because they could serve no useful purpose in their
flow through the lower gorge to the bay of San Francisco,
still there was no evidence introduced by the appellants to
support this allegation. The owner of land having an under-
ground water-bearing stratum supplied by the flood waters
of a stream has a primary right to the full flow of such waters,
in order to bring his stratum up to its water-bearing capacity.
In torrential streams, such as the Coyote River, floods vary in
extent with different seasons and in different years, and those
of one season or one year may be insufficient to supply the
underground stratum connected with the stream, while those
of another season or year may be more than sufficient. While
the owner of the underground stratum is only entitled to the
flow of the flood waters to the extent that they may replenish
his water-bearing stratum, still his right to the accustomed
flood flow of the stream for that purpose is paramount to that
of the right of an appropriator to divert any of the waters for
use beyond the watershed. If the accustomed flow is more
than necessary to supply the underground stratum, the burden
of proof is upon the appropriator seeking to appropriate the
surplus to show that there is a surplus. In the case at bar
the burden of proof was upon the defendants setting up a
claim to an alleged portion or surplus of flood waters upon
the ground that such waters were wasted or lost waters to
prove that fact. In the absence of such proof, a finding on the
averment was not necessary. (*Senter* v. *Senter,* 70 Cal. 619,
[11 Pac. 782]; *Murphy* v. *Bennett,* 68 Cal. 528, [9 Pac. 738];
*Gregory* v. *Gregory,* 102 Cal. 52, [36 Pac. 364].)

Aside from this, however, if it was intended to allege that a portion of these storm waters were wasted and lost waters at the point of intended diversion, the court found that they were not in those findings which we have recited, to the effect that the storm waters after passing the lower gorge sunk into the vast gravel beds below it and flowed into the several strata underlying the surface of the Santa Clara Valley and among others the stratum penetrated by the well of plaintiff; that the pressure of these storm waters largely increased the flow and percolation of water into the said underlying strata and that "such increase of water, of its pressure, of its rise into and flow from the wells, is proportionate to the volume of the storm waters flowing in the channel of the river," and that if defendants should divert a portion of said waters at the gorge, or at other places above the gorge, plaintiff would be prevented from having enough water in said gravel stratum underneath his land to irrigate his orchard or any considerable part thereof.

These are clear findings that there was no "waste or loss" of the storm waters until, at least, they had served the essential and necessary purpose of supplying to plaintiff their force and volume in forcing such supply into the vast gravel beds in which the various underlying strata referred to had their intakes and had flowed over these gravels on their way to the bay.

Nor can there be any ground of complaint that the court did not make any finding as to the exact *amount* of flood waters of the Coyote River which sunk and became part of the waters underlying the lands of plaintiff, or as to the exact *amount* of flood waters which did not sink but passed over the gravel beds in which these underlying strata had their intakes and were wasted and lost in the bay of San Francisco. There was no issue as to any *amount* or exact proportion of these waters which sunk or did not sink, the defendants asserting simply a right to divert at or near the lower gorge a *portion* of the storm waters which rushed down the channel of the river to the bay, and, as they alleged, became lost and wasted therein.

The complaint alleged that defendants were threatening and intending to divert and carry away "the waters of said Coyote River" beyond their own lands and prevent the same from ever returning to the river or flowing through the gravel

within the gorge and supplying the gravel stratum in which plaintiff's well was sunk, thereby depriving him of waters to irrigate his land and so irreparably damaging his land and orchard. This allegation that they were threatening and intending to take "the waters" of the river was, in effect, an allegation that they intended to divert all the waters thereof. The court on sufficient evidence, as we have already shown, found all these particular allegations of the complaint to be true and was a full finding of the *quantity* of storm waters which the defendant intended to take,—namely, all of them, even if it be assumed that an issue were made on the matter of quantity.

It is true that in another paragraph of the complaint it is alleged that the defendants "will divert a large portion of the surface waters of the Coyote River," accompanied by immediate further allegations that such diversion will prevent the flow of sufficient water to the well of plaintiff with which to irrigate his land. This allegation, as far as it alleged an intention on the part of defendants to divert a "large portion" of the surface waters of the river was not denied by defendants. In fact, they asserted such a right. The court found that they so intended and found that if they were permitted to do so it would prevent the well of plaintiff from being supplied with sufficient water for the purposes of irrigation. The plaintiff undoubtedly had, as against the defendants, a paramount right to have the flood waters supply by their flow, force, and volume the artesian stratum in which his well was sunk, and as the court found that if a "large portion" of these flood waters serving that purpose was diverted by defendants, the gravel stratum in which plaintiff's well is situated would be deprived of water to his irreparable injury, this finding was sufficient to sustain the judgment independent of any finding as to the exact *quantity* measured in second feet, or gallons, which went to make up this portion. The plaintiff being entitled to recover if deprived of his right to a full supply of his gravel stratum by the diversion of a "large portion" of flood waters, the exact quantity taken was immaterial, and the omission to find on an issue which, in no event, could affect the right of plaintiff to recover on the facts as found will not warrant a reversal of the judgment. (*Gregory* v. *Gregory*, 102 Cal. 52, [36 Pac. 364].)

Having disposed of (as far as we deem consideration necessary) the attack on the findings and the claim of alleged want of findings, and being satisfied that there is no merit in the points made relative thereto, we come now to a consideration of the legal principles involved on the appeal.

It is insisted by the appellants: 1. That as the plaintiff is a non-riparian owner he has no right to enjoin to any extent the diversion of the waters of the stream by an appropriator, on the ground that the stream contributes percolating waters to his non-riparian lands; and, 2. Even if he has, the court was not warranted in enjoining the defendants, as appropriators, from appropriating the flood waters of the Coyote River which they claim waste themselves in the bay, in order that another portion of the flood waters may continue to sink into the subsurface gravels and supply percolating waters to his non-riparian lands.

As an abstract proposition of law, applied to the concrete facts in this case, the contention of appellants is that, notwithstanding it is clearly established that the waters, surface and subsurface, which either flow or percolate through the channel of the Coyote River, at or above the lower gorge, pass through well-defined artesian gravel strata in the Santa Clara Valley connected with the stream itself, and furnish a supply of water for irrigation to a territory to which its use is essential, still that territory can be deprived of this inestimable benefit by an appropriator seeking to divert all the waters of the river away from the stream as a commercial proposition, thus rendering the lands overlying the various artesian strata valueless, and that owners of these superimposed lands have no rights which are invaded, and, hence, no right to apply for an injunction to restrain such a diversion.

The principal stress of the argument of appellants against the right of plaintiff to restrain their diversion of the waters flowing through the lower gorge and percolating into the subterranean stratum under the land of plaintiff, is based on the claim that plaintiff is not an owner of land riparian to the stream, who would be entitled to a flow of its waters, but is simply an owner of land situated above percolating waters supplied in part by percolation from the stream, who has no rights against an appropriator. This is, in effect, a contention that the rule at common law applicable to percolating

waters, which gave an owner of land all that lay beneath it with a right to interrupt and take away waters passing to his neighbors' wells—the doctrine of *cujus est solum*—governs the respective rights of plaintiff and defendants. But whatever the extent to which that doctrine may have heretofore obtained in this state, at least ever since the decision in *Katz v. Walkinshaw*, 141 Cal. 116, [99 Am. St. Rep. 35, 70 Pac. 663, 74 Pac. 766], it has been modified by the application of the more reasonable doctrine of *sic utere tuo* as to percolating waters.

It would be a waste of time to particularly discuss the reasons which impelled the modification of the common-law doctrine of an absolute right in each landholder (and as an appropriator the appellants insist upon this right)' to abstract all percolating waters under his land and dispose of them as he saw fit, without regard to what extent he might deplete these waters under the lands of his neighbors. The climatic conditions of this state, the great stretches of arid and semi-arid lands, the uncertainty of the seasons and varying rainfall, the necessity of irrigation and the vast superiority of underground waters as a steady and ready means of irrigation over the uncertainty of a similar supply from a surface stream which, in many instances, becomes dry at the very time when irrigation is necessary; the vast areas of land brought under cultivation and production by irrigation and additional areas still to be improved by it; the enormous draft which this constant improvement and cultivation makes on a supply which is limited and which will become inadequate for all as population increases and additional lands are to be brought under cultivation and improved by irrigation; these, and many other causes, impelled a departure from the old doctrine and a limitation of it and the adoption of the just principle that a common and essential necessity—water—when supplied to well-defined strata from whatever source should be preserved to lands overlying them for reasonable use upon them.

In *Katz v. Walkinshaw*, 141 Cal. 116, [99 Am. St. Rep. 35, 70 Pac. 663, 74 Pac. 766], in the opinion written by the late Justice Temple and in that written by Justice Shaw upon a rehearing (granted for further argument) the necessity for the modification of the *cujus est solum* doctrine as inap-

plicable to the conditions in this state was fully discussed, announced, and applied. In that case the defendant had sunk wells in the same artesian belt underlying the lands of plaintiff and in which his irrigation wells were sunk and was diverting the water for sale to lands distant from the saturated belt from which the artesian waters were derived. Defendant asserted there, like appellants as appropriators do now, that as these were percolating waters he had under the common-law rule to which we have just adverted, an absolute right to abstract them to any extent he saw fit and to use them anywhere he pleased, notwithstanding it would result in depriving the well of plaintiff of any supply for irrigation. The common-law rule was rejected as inapplicable to the conditions in this state and the rule of *sic utere tuo* announced, and applying it, it was held that the rights of the parties in the suit to take these particular waters were correlative and that the defendant could not divert them for sale elsewhere so as to prevent plaintiff from obtaining a reasonable supply for irrigation and other ordinary uses upon his land. The doctrine thus announced in this pioneer case has been subsequently followed so that the rule is now settled beyond further question. (See *McClintock* v. *Hudson,* 141 Cal. 281, [74 Pac. 849] *Cohen* v. *La Cañada etc. Co.,* 142 Cal. 437, [76 Pac. 47]; *Montecito etc. Co.* v. *Santa Barbara,* 144 Cal. 584, [7.7 Pac. 1113]; *Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655, [93 Pac. 1021]; *Burr* v. *Maclay,* 154 Cal. 439, [98 Pac. 260]; *Hudson* v. *Dailey,* 156 Cal. 617, [105 Pac. 748].)

But, it is insisted by appellants that this rule only applies as to correlative rights of different persons owning lands overlying the same plane of percolating waters and does not apply so as to entitle a non-riparian owner, although the stratum underlying his land is directly supplied by waters percolating from the stream to prevent the diversion of the waters of the stream by an appropriator. The precise question as to the respective rights of an appropriator of water to be used beyond the watershed and of one claiming an uninterrupted flow of these waters to supply by percolation a water-bearing stratum underneath his land and connected with the stream, has not been heretofore presented. But there are general principles of law which have been applied as between other appropriators of the stream waters and claimants to the flow

or to the percolating waters of the stream which are equally applicable as between the parties to this action. It is true in this case that the plaintiff is not a riparian owner, but neither does it appear, as far as their rights are here asserted, that appellants are. They are only asserting rights as appropriators under a claim that they have appropriated all the surplus waters of the Coyote River and are entitled to certain impounded waters between the gorges. Be that as it may, however, as far as any waters of the river are concerned (there being no impounded waters), we do not perceive that the fact that the plaintiff is not a riparian owner can affect his rights as against the appellants. As between riparian owners, it is conceded, as the law declares, that one riparian owner is not entitled to divert the waters of a stream for use at some distant point for commercial purposes so as to prevent another riparian owner to whom they would otherwise be available from using them on his lands, and, it is established by the authorities to which we have heretofore referred that, as between owners of land overlying a common substratum of percolating water, this cannot be done. This being so, we perceive no reason why the same rule should not be applied as between owners of land overlying a substratum of water directly connected with either the surface or subsurface flow of the stream and deriving practically its exclusive supply from that source. The theory upon which the right of a riparian owner to be protected in the use of the waters of a stream to which his lands are riparian is that, nature having given these lands the benefit of the flow and the natural advantage of its use on the lands, one riparian owner may not divert these waters to lands not riparian, to the injury of another riparian owner who can use them. The same principle has been applied, as we have seen, to the use of waters as between the owners of lands overlying a common stratum of percolating waters. . And we perceive no reason why the same principle should not be applied as between an appropriator of the waters of a stream to be taken beyond the watershed for commercial purposes and the owners of lands overlying an artesian stratum which is conclusively shown to be so connected with the stream as to derive its supply of water by percolation therefrom to this stratum. Why, in principle, should there be any distinction? With the

common-law doctrine modified to meet the conditions in this state necessitating it and modified so as to preserve to each owner of lands overlying a common stratum of percolating waters a right to a fair and reasonable use of these waters of which their lands have a natural advantage, no reason suggests itself why the same rule should not apply as between the appropriators of the waters of a stream for use elsewhere than on riparian lands and the owners of lands overlying a water-bearing channel, so directly connected with the stream as to be supplied by percolation from it. The conditions in all cases are analogous as far as the natural supply of waters is available for use upon the lands concerned, whether the lands be riparian to the stream or overlying a common subterranean stratum, or whether the underlying strata are connected and supplied directly from the flow of the stream itself. In either case there is a natural supply of water of which the lands by reason of their location, either as riparian or above a common subterranean stratum, or as lying over a water-bearing stratum supplied by percolation from the stream, have a natural advantage to the use of the waters. Lands are invariably purchased in view of the benefits which they may derive from being riparian to a stream or overlying well-supplied strata of water, the right to the flow or extraction of which is a part and parcel of the land, and there is no rational basis for any distinction between the classes as to the right to prevent a diversion of waters for use elsewhere, whether it be attempted by a riparian owner against another riparian owner or by one owner of land over a common stratum of underlying water against another owner, or by an appropriator of the waters of a stream as against the owner of land overlying the water-bearing stratum directly supplied by percolation from the stream. As far as the owner of lands overlying a gravel stratum is concerned it makes no difference in his rights as against an appropriator of the water from what source the supply comes which directly supplies his water-bearing stratum—whether from a stream or a saturated plane or other body of water which by natural flow or percolation, either surface or subterranean, clearly supplies his underground stratum. It would present an anomalous condition of the law were it the rule that while a riparian owner may prevent an appropriator from diverting

to his injury the waters of the stream for use beyond the watershed and one owner of land overlying a common stratum of percolating water may restrain another owner similarly situated from making a like diversion, the owner of lands whose underlying stratum of water is directly and clearly supplied by percolation from the waters of the stream and who will be greatly injured by a diversion is not entitled to prevent it. There is no reason or any difference in the rule between the classes and none should exist. Such land-owner has a right to restrain a diversion from the stream or saturated plane or other well-defined supply, by an appropriator or any one else who seeks to divert such stream or other supplying waters from their natural percolating flow, for use elsewhere than upon lands to which, as waters of the stream, they are riparian, or which, as waters of an underground stratum, may reasonably and usefully be applied to the overlying land. Under this rule, as far as the artesian stratum of plaintiff, which is a well-defined one and has its intake in the vast bed of gravel in the lower gorge, is supplied by the surface waters of the Coyote River passing over said gorge and percolating to the stratum, or is supplied by the subsurface waters in the Coyote Valley between the upper and lower gorge (assuming for present purposes that these may not be considered as a part of the river) which pass over the lower gorge and percolate through the gravels below and into the artesian stratum of plaintiff, or as far as the stratum is supplied by percolation from both of these sources, the right of plaintiff to have the flow of these waters in his stratum uninterrupted is paramount to the right of defendants to divert them for use elsewhere as the court found they intended to do, to the irreparable injury of plaintiff, and plaintiff was entitled to a decree enjoining such diversion.

But it is insisted by appellants that if the plaintiff has a right to enjoin the diversion of the waters of the stream which would otherwise percolate to and supply the artesian stratum underlying his land, the court was not warranted in enjoining the appellants from diverting the flood waters of the Coyote River which it was claimed were wasted and lost in the bay of San Francisco. There can be no question but that an appropriator of water may divert for use to any point beyond the watershed any portion of the waters of a stream which

can serve no useful purpose either to the riparian owners
or, in the instant case, any waters of the Coyote River which
might serve no such purposes in supplying the underground
stratum of plaintiff or which are in excess of the quantity
necessary for that purpose. (*Fifield* v. *Spring Valley Water·
Works,* 130 Cal. 552, [62 Pac. 1054].)

But it is quite obvious that merely because waters are flood'
or storm waters of a stream—that is, on account of unusual.
rains the waters of a stream are increased beyond the normal
flow—that these flood or storm waters are not, therefore, sur-·
plus waters of the stream which serve no useful purpose and
are subject to appropriation. What are called the storm
waters of the Coyote River are not waters which are pre-
cipitated over the lower gorge only in occasional seasons.
They are generally of annual occurrence and flow at great
height and breadth over the deep porous gravel beds below
the lower gorge, although they last but a short time. They are
confined to the general channel of the stream as the banks.
of the Coyote River are of great height, in some places as.
high as thirty-eight feet, and within the memory of man, no ·
overflow of the river until it gets to the low land near the
bay, has ever been known. But even if these storms are of ·
short duration and the waters are precipitated with great.
rapidity into the bay, they cannot be said for that reason
alone to be waste waters or subject to appropriation. They are ·
only waste waters and capable of appropriation as such if they ·
serve no useful purpose as storm waters. But in the case
at bar there can be no question but that the flood waters per-
form not only a useful but an indispensable service in pressing ·
into the gravel beds or trough at the lower gorge by their
great breadth and enormous weight a large portion of the ·
waters which go to supply the various artesian strata, includ-
ing that of plaintiff which have their intake therein. The ·
extent to which these waters sink into these gravels below
that gorge depends upon and is proportioned to the pressure
exerted by the breadth and volume of the storm waters. The
subsurface flow of twenty million gallons per day does not
keep up the supply and that supply is augmented and is only
partially kept up by the waters which are forced into the ·
gravels at the lower gorge by the pressure of the flood waters.
There are some years when there are no flood waters at all, .

and years when such floods as come are comparatively small, and there are also dry years occasioned through less than the ordinary rainfall. In every year when there are no floods and in every dry year the waters in these gravels suffer additional depletion on account of the extent of the drafts for irrigation which are necessarily made upon them to meet the deficiency in the rainfall, and this depletion is only partly restored by the flood waters of subsequent years. The water-plane in these gravels, and consequently in the various strata to which it is supplied is, as the evidence shows, gradually lowering. Neither the gravels nor these underground strata have been completely filled since a season of unusual rains in the years 1861-62 when the flood waters brought them up to their full water-bearing capacity, and, hence, there was a surplus of flood waters which may be said to have served no useful purpose and were wasted in the bay. Since then on account of the increase of population and the improvement of the valley, the high state of cultivation to which lands have been and are being brought on account of their susceptibility to irrigation from these underground artesian strata and the consequent vast drafts made by the increasing number of wells sunk therein, the water-plane by continuous and extensive irrigation during the summer seasons has been and is yearly gradually being lowered so that the flood waters, even to the extent to which they contribute of themselves to replenish the supply and under the pressure of their breadth and volume effect it, still do not bring these artesian strata up to near their full capacity. And the extent to which these artesian strata are now supplied, which is less than their full capacity, and which must be still further depleted as additional lands are brought into cultivation and irrigation from wells sunk into them is, in addition to this daily supply of twenty million gallons always flowing through the lower gorge, derived solely from the storm waters and is supplied in proportion to their breadth and volume. It is quite obvious that as the storm waters flowing over the gravels of the lower gorge do not, even under their enormous pressure, now bring the various artesian strata having their intake therein up to their full capacity, and in the nature of things must be further depleted as additional well drafts are made upon it, to permit them to be diverted at or near the lower

gorge must inevitably deprive the various gravel strata, including that of plaintiff, of their usual water supply, and as the court found, these strata within a few years would not yield enough water for profitable or successful irrigation, nor yield more water than the surface wells. As it appears, therefore, that all these flood waters, either by partially sinking into the gravels, or by their breadth and weight causing an increased surface sinking, are inadequate to fully supply the underground waters in these artesian strata, it is quite clear that it cannot be said that any portion of them are waste or lost waters which the appellants are entitled to divert from the stream above the lower gorge. All these waters are necessary of themselves or by their force to supply the underground waters which they, even now, fail to do to the full capacity of the underlying strata, to which full capacity the plaintiff and others interested in them are entitled. Performing this necessary and indispensable service which could not be supplied without them, no part of them can be said to be waste waters until they have performed it, as far as they are capable of doing so, and have passed over the gravels on their way to the bay. This seems to be so plain as to require no further particular discussion. If at any time these flood waters, or any portion of them, can be characterized as waste waters in their flow from the upper gorge towards the bay, it certainly is not while they are in the river above the lower gorge where appellants desire to divert them. If they become waste waters it is only after they have passed the gravels at the lower gorge and have performed the necessary and useful purpose of supplying them and the artesian strata connected with them, as far as they are capable of doing so, and from there are rushing towards the bay. We are not prepared to say that, even in their flow after passing the gravels in which the intake to these artesian strata lie, they serve no other useful purpose, but certainly these storm waters do not become waste until they have flowed over these gravel beds and are on their way to the bay. It is only there that it may be said that they can perform no further useful service; the only place where they first become waste waters and where, without apparently invading the rights of any one, they may be diverted. No reasonable objection could be made to the diversion of the waters by the appellants there because they are then, for all

practical purposes, waste waters. But it is quite clear that this is the only point on the stream where it can be said, as far as plaintiff is concerned, that they are waste waters.

Coming now to a consideration of the objections of appellants to the decree.

It is insisted that the court should have secured the appellants in the right to divert the waters from the gravels of the lower gorge to the extent that their present shaft, pump, and appliances would permit. There can be no question but that the plaintiff brought this action for an injunction to restrain this particular diversion of the waters as soon as it reasonably appeared that the proposed diversion by the pump and appliances of appellants as installed and operated would affec'; the supply of water in his artesian stratum. So the appellants were not entitled to be secured in the operation of their plant and their diversion of water by that means on the ground that the plaintiff stood by and permitted the development of water to be made to successful operation, having reasonable cause to believe that it would affect his water supply (*Katz* v. *Walkinshaw*, 141 Cal. 116, [99 Am. St. Rep. 35, 70 Pac. 663, 74 Pac. 766]), and as the court found by evidence sustaining the fact, that if permitted to proceed with such pumping with the appliances as installed the plane of water in the gravel below the lower gorge would be lowered to such an extent that it would be below the intake of the gravel stratum in the land of plaintiff and his well thereby be entirely deprived of water, the court properly enjoined the further operation of said pump and appliances.

It is further insisted that the court should have framed a decree permitting the appellants to store waters of the watershed in reservoirs in the mountains above the lower gorge and require them in each season to permit fifty-five hundred millions of gallons to pass the upper gorge in such quantities as would allow it to sink into the gravels below the lower gorge. This claim is made on the theory that this would exceed in amount that which is contributed to the gravels below the lower gorge by the sinking of the flood waters. The respondent questions the accuracy of this estimate and the feasibility of this plan as well as the power of the court to so frame a decree respecting the matter as will give the court immediate and effectual control of the acts of the defendants. so as to

see that it is carried out and to prevent injury to those rely-
ing upon the underground supply as nature gives it for the
irrigation of their lands, an injury which would be the in-
evitable result of any delay or failure in turning in the amount
specified. It is insisted, too, that the right of this plaintiff to
the waters percolating through his land is a vested right and
that the right to have the flow of the flood waters contribute
to this percolating supply is equally a vested right which the
court has no authority to permit to be disturbed or of which
the plaintiff may be deprived except under condemnation pro-
ceedings and upon payment therefor. Other objections to such
a decree are also urged which it is unnecessary to state. Nor
do we deem discussion or decision upon any of them necessary,
because, in the state of the pleadings and proofs in the case,
we do not think the court erred in failing to make a decree as
suggested by appellants, even if under them the court had the
right to do so. This case was not tried on the theory that the
appellants were entitled to any such decree. There is nothing
in the pleadings in the case remotely suggesting that the court
should make such a decree, or that the appellants would be
satisfied with it if it did; nor was any evidence presented in
the case addressed to the making of any such decree. The
trial court was neither advised under the pleadings, nor was
suggestion made on the trial that such a decree was proper.
The claim of appellants was against the right of plaintiff to
any relief or protection whatever against the diversion of the
waters of the Coyote River, either surface or subsurface. They
insisted in the trial court, and likewise insist here, that plain-
tiff, not being a riparian owner, had no right to prevent the
diversion of the waters of the river, either the normal surface
flow or the subsurface flow or any percolating water, and that,
as far as the storm waters were concerned, that they had a
right to divert, above the lower gorge, all the waters that
flowed down to the bay of San Francisco irrespective of any
benefit they afforded in filling the gravels below the lower
gorge and supplying the artesian stratum of plaintiff which
had its intake therein. Asserting that plaintiff had no right
to have these waters supply his artesian stratum under nature's
plan, they now ask that the decree of the trial court be re-
versed because that tribunal did not adopt an artificial plan
which was not suggested by the pleadings, to which no proof

was particularly addressed, nor the trial court asked to make, and which is, for the first time in the case, suggested here and then, as ground for reversal. Under the circumstances stated the appellants, if they had been entitled to such a decree under proper pleadings and proof, are in no position now to complain because it was not made by the trial court. As the appellants did not assert any right to impound the storm waters and release them in any given quantity to the gravels below the gorge so as to supply plaintiff's and the other artesian strata, but asserted that plaintiff had no right to any of these waters, but that appellants had a perfect right to divert and use them all, they cannot be heard to complain that the court did not embrace in its decree a plan which they had never asserted a specific right to or asked to be made. (*Huffner* v. *Sawday,* 153 Cal. 86, 93, [94 Pac. 424].)

This disposes of the principal attack of appellants against the findings upon the claim of an alleged want of findings and relative to their objections to the decree. Several other points are made which, while we have examined them, we do not think of sufficient importance to command particular discussion.

We are satisfied that the findings as made are sustained by the evidence and the decree supported by the findings, and the judgment and order appealed from are therefore affirmed.

Angellotti, J., Sloss, J., Melvin, J., and Henshaw, J., concurred.

SHAW, J., concurring.—I concur in the judgment and in the opinion of Justice Lorigan.

I believe, however, that the claim of defendants to the so-called waste flood waters, may well be decided on the merits. · A well-established but infrequently used principle of the law of injunctions is peculiarly applicable to the case. Beach on Injunctions states it thus: "When an injunction to restrain a nuisance will produce great public or private mischief, a court of equity is not bound to grant it merely for the purpose of protecting a technical or unsubstantial right." (Vol. 2, sec. 1067.) High on Injunctions gives it in this form: "The court may properly be guided by the consideration of the relative convenience of the parties; and if it appears that the benefit resulting to the plaintiff from the granting of the writ

will be slight as compared to the injury to the defendant, the relief may be denied and the plaintiff left to the pursuit of his remedy at law." (Vol. 2, 4th ed., sec. 470.) See, also, *Peterson* v. *Santa Rosa,* 119 Cal. 391, [51 Pac. 557] ; *Jacob* v. *Day,* 111 Cal. 571, 580, [44 Pac. 243], for applications of the principle.

This principle is stated in these authorities with reference to the refusal of an injunction. It is a flexible rule, however, and it will apply to either party and to the granting or refusal of the injunction, according to the circumstances of the particular case. And in the varying conditions to be found in the different parts of this state, this adaptability makes it of the greater value, if wisely administered. In many parts of the state, especially in the large interior valleys, practically all the flood waters are waste waters. They contribute little or nothing to the saturation of any subterranean gravel beds which are resorted to for a supply of water for useful purposes. They rush in great volume to the sea, carrying destruction in their path and overflowing the low lands to the great damage of the owners, serving no useful purpose whatever. If they were stored in reservoirs they might be made to serve a triple purpose. The extreme floods and consequent overflow and destruction would be prevented; the stored water could be used to irrigate large areas of valley land, now left unproductive for lack of water; if distributed upon the plains, for irrigation, a large portion of these waters would in due course of time find their way by seepage and percolation to the channels of the streams, giving an increased and more regular flow in the summer months, increasing the amount available for irrigation in the smaller streams and bettering the navigation of the large rivers; all of which would add tremendously to the growth, prosperity and wealth of the state and to its ability to support the large population which its climate and productions attract. The question of the right to store such flood waters and the terms upon which it can be obtained or exercised is of the greatest importance to the future welfare of the state. In such parts of the state, an injunction to prevent the storage of such flood waters might perhaps, as a general thing, be properly denied.

But in the case at bar, the conditions above described do not exist. The reverse is true. The Santa Clara Valley presents

conditions not paralleled elsewhere in the state, except it may be in the San Fernando Valley, in which is found similar gravel beds kept supplied by similar flood waters and rainfall, the use of which water is secured to the city of Los Angeles by its ancient pueblo right. In the Santa Clara Valley a large community has settled upon the lands over the gravel beds in question and, by the use of the waters stored therein, has made probably the richest and most productive region of equal size in the state. Plaintiff is but one of these but he represents a large population engaged in like pursuits. The property of every one of them would be jeopardized by a diminution of the waters that go into this underground reservoir. The floods from which it can be asserted with any reasonable assurance that waste occurs, are infrequent. They come at intervals of several years, and generally the waste water is small and practically indeterminable. The right to obtain such small quantities at such wide intervals for storage in open reservoirs where evaporation would dissipate a large part during the time it would have to be stored to be made of real use, would be of little value, and probably of none at all. It is obvious from the whole case, that the individual defendants never would have inaugurated their enterprise with nothing in view but the privilege of ascertaining, storing, and using these chance waste waters. It would be impracticable and unprofitable. The giving of a decree permitting the storage of such water as could be ascertained to be thus wasted, on the rare occasions when there is any waste, and the refusal of an injunction against such storage, would be of no substantial benefit to the defendants, and would have no practical effect except to render the rights of a large number of persons more precarious and their property less valuable, and possibly less productive. In view of all these circumstances I am of the opinion that the injunction was properly extended to include all the waters in controversy.