[Sac. No. 4392. In Bank.—September 16, 1933.]

CHOWCHILLA FARMS INCORPORATED (a Corporation), Appellant, v. HARRY LEE MARTIN et al., Respondents.

(1)

2

Milton T. Farmer, F. G. Athearn, Philip H. Angell and Walter Hoffman for Appellant.

Finlayson, Bennett & Morrow, Hadsell, Sweet & Ingalls, Hadsell, Sweet, Ingalls & Lamb, Dan Hadsell, Frank G. Finlayson and James Bennett for Respondents.

CURTIS, J.—Plaintiff is the owner of land riparian to the San Joaquin River in Madera and Merced Counties. These lands lie some fifteen to twenty miles below the junction of said river and Fresno Slough. San Joaquin River rises in the high Sierra Nevada Mountains and flows in a generally westerly direction into the valley of the same name. When it reaches the floor of the valley, at or near where it is joined by Fresno Slough, it makes an abrupt turn to the north and flows in a generally northerly direction until it unites with the Sacramento River, and from said point the combined waters of the two rivers flow through certain bays and straits, including San Francisco Bay, into the Pacific Ocean. Kings River is situated some thirty miles southerly of the San Joaquin River and, like the latter, rises in the Sierra Nevada Mountains, and flows in a westerly course substantially parallel to the San Joaquin River, and before any artificial means were constructed for the purpose of diverting it from its original course, its waters to a large extent flowed into Tulare Lake, situated in the upper or southerly end of San Joaquin Valley. If, however, as often happened in seasons of heavy rainfall or periods of melting snow, the rivers to the south of Kings River, emptying into Tulare Lake, had filled said lake to the limits of its capacity, the waters of Kings River, or at least a large portion thereof, would be diverted to the north into Summit Lake, and from Summit Lake they would overflow into Fresno Swamp, and from said swamp they would find their way into Fresno Slough, and thence into San Joaquin River. Fresno Slough from its junction with the San Joaquin River extends in a southeasterly course a distance of about thirteen or fourteen miles into Fresno Swamp. Fresno Swamp lies between San Joaquin River to the north and Tulare Lake to the south. It was, in its original state, approximately forty to fifty miles in length and from three to eight miles in width. It was overgrown with tules and other vegetation and consisted approximately of 110,000 acres. Not only would waters from Kings River flow into

Fresno Swamp through Summit Lake, but in seasons of high water Kings River would overflow its banks at points farther upstream and, following the course of certain sloughs leading from Kings River, said waters would flow into said swamp. These waters, like those from Summit Lake, after they reached the swamp would eventually find their way into Fresno Slough. Fresno Slough not only received water from Kings River in the manner just stated, but, during seasons of high water, San Joaquin River spilled waters through a number of channels or sloughs "from the north into Fresno slough, thereby causing the water in Fresno slough to back up" and overflow for several miles the land in Fresno Swamp lying above and adjacent to the head of Fresno Slough.

Beginning in the year about 1870, and continuing for a number of years, the owners of land in this locality made certain developments for the purpose of bringing their lands under cultivation which materially changed the natural conditions existing in and about Fresno Swamp. These developments took place at the upper and lower ends of the swamp and eventually extended through its entire length. Land owners in the vicinity of the upper end of the swamp and adjoining Kings River made cuts in its northerly bank and, through channels connected with the river, diverted water from the river onto their lands, for the purpose of irrigating the same. These channels leading from the river increased in size from year to year, partly through human agencies and partly by the action of the waters. One of these channels from Kings River to lands located to the north thereof was known as the Zalda Canal. This canal had its beginning at a point on the Kings River a little north of west of Summit Lake and ran in a generally westerly course in the direction of said lake. This channel came to be known as the north fork of the Kings River, and is frequently referred to as the north fork or the Zalda Canal. At the same time at the lower end of the swamp a trench was dug about three and one-half miles in length connecting Fresno Slough with one of the sloughs in the Fresno Swamp called Fish Slough. This trench was constructed by Jefferson James and was known as the James trench or channel. This trench acted as an outlet for the waters flowing into Fresno Swamp which had been materially aug-

mented by the construction of the Zalda Canal. From a period of time beginning soon after the construction of the Zalda Canal, as just related, and continuing to about the year 1910, a number of private and independent reclamation projects were commenced and carried on by the owners of land lying within or bordering upon Fresno Swamp, having as their object the reclamation of lands within the swamp and the protection of lands bordering the swamp from the overflow by water running through the swamp. The effect of these projects was to gradually narrow the width of the surface of the swamp over which the waters flowing into the swamp from Kings River ran on their way to Fresno Slough and then into the San Joaquin River.

Because of the frequent failure of these smaller projects, reclamation works on a large scale were undertaken in 1910, and their construction was continued with large equipment for three or four years. The work was done with a dredge, and extended from the north fork or Zalda Canal to the neighborhood of Summit Lake, and thence in a northwesterly direction to Fresno Slough. Two heavy levees were built, forming a by-pass 800 feet in width, with a capacity of something over 5,000 cubic feet of water per second. This by-pass connected the north fork or Zalda Canal with Fresno Slough. Since the construction of this by-pass, waters which usually flowed from Kings River into said swamp, except those which were taken out and used by the owners of land lying along said canal, ran through the canal until it reached Fresno Slough—thence into the San Joaquin River. This by-pass was completed in 1914. In January, 1925, some of the defendants initiated proceedings whereby they planned to divert the waters, or a large portion thereof, from the north fork, at a point above the intake of the by-pass, and thereby prevent them from flowing therein to the San Joaquin River, and to conduct and use the same on nonriparian lands in the vicinity of Tulare Lake. Two applications were filed by said defendants for permits to appropriate said waters before the department of public works of the state of California, division of public water rights. These applications were at the time of the trial of said action still pending before said department. Since the filing of said applications, three of said defendants, Martin, Goodfellow and Heffner, have constructed a

channel beginning fifty feet south of a point on the north fork above the intake of the by-pass, and extending southwesterly to lands in the vicinity of Tulare Lake. This channel has a capacity of 5,000 cubic feet per second of water. It is the intention of said defendants to transfer their interest therein to the defendant Tulare Lake Basin Water Storage District, and it is the intention of the district to acquire said channel and by means thereof to divert water from the north fork, to the capacity of said channel, and conduct the same to the lands of Tulare Lake Basin Water Storage District situated in the vicinity of Lake Tulare. It is conceded that the waters which these defendants propose and plan to divert from the north fork or Zalda Canal through said channel to the lands of the Tulare Lake Basin Water Storage District would otherwise, ''if not taken by them, flow through said Zalda canal and Fresno slough into the San Joaquin river''. It was to enjoin and restrain this diversion of water that plaintiff instituted this action against said defendants. Pleadings were filed setting forth the rights of the respective parties, and upon these pleadings the action was tried. Findings of fact were made by the court in favor of the defendants, and from this judgment the plaintiff has appealed.

Three major questions are raised on this appeal. They are:

(1) Was there a natural channel extending through Fresno Swamp connecting Kings River with the San Joaquin River, so that in a state of nature the waters from Kings River flowed through said channel into San Joaquin River? This question might also be stated in a different form as follows: Was Kings River, in a state of nature and before any changes were made in the natural conditions existing in Fresno Swamp, tributary to San Joaquin River?

(2) Has the artificial channel constructed through Fresno Swamp, which channel now connects the two rivers, existed for such a length of time as the natural drainage channel through which the waters of Kings River have flowed into San Joaquin River that its origin is immaterial to this case? An affirmative answer to this question would also answer in the affirmative the related question: Has the plaintiff, as riparian owner of lands on the San Joaquin River below the junction of said artificial channel with the San Joaquin

River, acquired the right, as such riparian owner, to the use of waters flowing from Kings River through said artificial channel to the extent that it may enjoin the threatened diversion thereof by the defendants?

(3) Are there unusual, unexpected and extraordinary waters flowing in Kings River to which plaintiff's riparian right does not attach?

We will consider these questions in the order stated.

First. Was Kings River, in a state of nature and before any artificial changes were made in the condition existing in Fresno Swamp, tributary to San Joaquin River? The answer to this question must be determined by the existence or nonexistence of a natural watercourse through said swamp connecting the two rivers. Upon this question the court found: "That in a state of nature and prior to the artificial changes that are elsewhere described in these findings, the waters of Kings river that found their way into said [Fresno] swamp did not flow through said swamp in a natural watercourse; that said swamp was not a watercourse but was a catchment area for the overflow waters of Kings river and San Joaquin river." The artificial changes referred to in this finding are these changes which we have already noted as having taken place in Fresno Swamp and which finally resulted in the construction of the north fork or Zalda Canal and the by-pass, connecting Kings River with Fresno Slough. We have here a direct finding of the trial court that no natural watercourse existed through Fresno Swamp and that Kings River did not in a state of nature flow through any natural watercourse into San Joaquin River. While neither of the parties has discussed the question as to whether such a finding is one of fact or law, we think this question is one of substantial importance to the arriving at a correct determination of this controversy. If the question is one of fact, then we are to ascertain only whether there is any substantial evidence in the record to support it, and if there is, then we may not disturb it. Whether a natural watercourse existed through Fresno Swamp, connecting Kings River with the San Joaquin River, was one of the sharply contested questions before the trial court, and many days were spent in the introduction of evidence of the respective parties as to the existence of such natural channel or watercourse. The testimony of

many lay as well as expert witnesses was produced upon this issue. Some of these witnesses went back to the early days before any artificial changes of any consequence had been made in Fresno Swamp. Others testified to conditions existing at later dates. Nothing would be gained by a review of the testimony of these witnesses. It is sufficient to say that the evidence was such that it would have justified a finding of the court either way upon the question of the existence of a natural watercourse through Fresno Swamp. Therefore, if that question is one of fact, the finding of the court in this case as to the nonexistence of a natural watercourse through said swamp must stand and, to the extent that that fact is decisive of any issues in this case, said finding would affect the final determination of this action.

In the recent case of *Patterson* v. *Spring Valley Water Co.*, 207 Cal. 739 [279 Pac. 1001, 1002], one of the questions before the court was whether Crandall Slough was a natural watercourse. The trial court found that it was not, as it did not have the physical characteristics of a watercourse. The court further found that another channel called "The Splits" was an artificial and not a natural channel. In considering these findings this court stated that, "The only questions presented by the appeal with reference to the first two contentions of plaintiffs is whether or not these findings with reference to Crandall slough and The Splits are sustained by the evidence." The opinion in that case then proceeds to state the third contention of plaintiffs, and after that statement resumed consideration of the findings regarding Crandall Slough and The Splits. Upon that question it is stated: "We have examined the record for evidence upon which the findings with reference to Crandall slough and The Splits might be based and we consider the evidence sufficient to support the findings which concludes the first inquiry raised upon the appeal." It is evident from the reading of the opinion in that case that this court treated the finding that Crandall Slough was not a natural watercourse as a finding of fact, and declined to consider the evidence upon that subject except to determine whether it was sufficient to support said finding of fact. This result is made more apparent when we examine the briefs before this court on said appeal. We there find that the question as to whether said finding was one of law or fact was

10

squarely presented, and authorities were cited in support
of the views of the respective parties. Plaintiffs in said
action, in support of their contention that such a finding
was one of law, cited the cases of *Sanguinetti* v. *Pock*, 136
Cal. 466 [69 Pac. 98, 89 Am. St. Rep. 169], and *Gray* v.
*Reclamation District*, 174 Cal. 622 [163 Pac. 1024], while
the defendant relied upon *Harris* v. *Harrison*, 93 Cal. 676
[29 Pac. 325], *Edgar* v. *Stevenson*, 70 Cal. 286 [11 Pac.
704], and *Wilkins* v. *McCue*, 46 Cal. 656, contending that
they held a contrary doctrine. After weighing these author-
ities, this court in its decision treated the question of the
existence of a natural watercourse as one of fact and
predicated its decision upon the law as so construed. In
view of this very recent determination of that question by
this court, we are constrained to hold that the finding of
the trial court in this case that no natural watercourse
existed in Fresno Swamp was a finding of fact and, as it
is supported by ample evidence in the case, it is conclusive
of that issue and this court is without authority to disturb
such determination.

 Notwithstanding the conclusiveness of the finding
of the trial court upon that subject, the plaintiff contends
that the court should take judicial notice that a natural
watercourse extended through Fresno Swamp, connecting
Kings River with Fresno Slough and the San Joaquin
River. In support of this contention the plaintiff directs
the attention of the court to certain early statutes enacted
by the legislature of this state, and also to certain decisions
of this court rendered in actions involving the waters of
Fresno Slough, as well as to certain public documents on
file among the records of our state and national govern-
ments, in which the waters of Kings River and those of the
San Joaquin River were given consideration. The early
statutes of this state relied upon by plaintiff declare the
San Joaquin River to be navigable from its mouth to Tulare
Lake. (Stats. 1851, p. 423; 1854, p. 81; 1860, p. 168;
1861, p. 274, and 1869–70, p. 721.) The decisions of this
court referred to by the plaintiff, in which is to be found
language to the effect that Fresno Slough is a natural tribu-
tary of Kings River, are *Miller & Lux* v. *Enterprise Canal
Co.*, 145 Cal. 652, 655, 657 [79 Pac. 439], *Miller & Lux*
v. *Enterprise Canal Co.*, 169 Cal. 415, 420 [147 Pac. 567],

*Turner* v. *James Canal Co.*, 155 Cal. 82, 85, 91 [99 Pac. 520, 132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401], and *Crescent Canal Co.* v. *Montgomery*, 124 Cal. 134, 136 [56 Pac. 797]. There is nothing in the aforesaid statutes of this state, the opinions of this court, or the public documents, which would compel or even justify the trial court or this court in declaring, upon knowledge derived from said statutes, decisions or documents, that a natural watercourse extended through Fresno Swamp. As we have already stated, this question was one of the sharply contested issues before the trial court and many days were spent in the introduction of testimony by the respective parties as to the existence or nonexistence of such a watercourse. It is apparent that whether a natural watercourse existed through said swamp was a matter of grave doubt in the mind of the trial court as well as in the minds of the parties themselves. It is true that courts will take judicial notice of matters of general knowledge, but it is a power to be exercised with caution. "If there is any doubt whatever, either of the fact thereof or as to its being a matter of common knowledge, evidence should be required." (*Varcoe* v. *Lee*, 180 Cal. 338, 345 [181 Pac. 223, 226].) We are, therefore, of the opinion that the issue as to the existence or nonexistence of a natural watercourse through Fresno Swamp was one which was properly decided by the trial court upon the oral and documentary evidence produced in court upon the trial of such issue, and that neither the trial court nor this court should decide said issue upon the knowledge gained by it through reference to the public records above enumerated.

The second contention made by the appellant is that although there originally was no natural watercourse through Fresno Swamp leading from the Kings River to the San Joaquin River, the artificial channel now connecting the two rivers has existed over such a length of time that its origin is immaterial and that it has now all the characteristics of a natural channel, and that the waters diverted by said channel from Kings River into San Joaquin River have acquired the state of natural waters of said last-named river, and the owners of land riparian to San Joaquin River have acquired and now enjoy the same rights in

said waters as they possess in the natural waters of said river.

As we have stated above, the present artificial channel connecting the two rivers was completed in 1914, some eleven years before the defendants asserted any right to divert any water therefrom for use on land within the storage district situated within the vicinity of Tulare Lake. But long before the commencement of work on said by-pass in 1910, substantial changes had been made in the territory between Kings and San Joaquin Rivers, which materially increased the amount of water naturally flowing from Kings River toward San Joaquin River. The first of these changes, as we have seen, took place in about the year 1870. In that year, or possibly before, a Mr. Cole ran a furrow connecting Kings River with Cole Slough. Cole Slough was upstream from the point where the north fork or Zalda Canal was later constructed. Through this furrow connecting with Cole Slough a considerable amount of additional water was caused to flow from Kings River into Fresno Swamp. The Zalda Canal had its beginning in about the year 1872, when Captain Esrey, with the aid of a number of Indians, cut the banks of the Kings River, and through this cut diverted waters from the river onto lands to the north and west of the river. At first this canal carried water only during periods of high water, but later water was running through it during the whole year, and as early as 1884 it had cut a channel from the river to Summit Lake. In 1909, the bed of the channel was eight feet below the bed of the river. One witness testified that even before 1909 it was carrying all the waters of the river during times of normal high water. It will thus be seen that over forty years before the defendants asserted any right to the waters flowing through said channel, a substantial part of the waters of Kings River, by means of the artificial changes above enumerated, had been diverted into the sloughs and waterways within Fresno Swamp, including the enlarged James cut into Fresno Slough, and for the last sixteen years of said period of time before the defendants set up any claim to the waters of said stream practically all, if not the whole, of the waters of Kings River had been diverted from its original course and into said artificial channel, through which it flowed to Fresno Slough and thence into the San

Joaquin River along, over and onto plaintiff's said lands. Under this state of facts can the channel thus formed, and which has been maintained and in use in the manner and for the period of time above stated, be regarded as a natural watercourse? The decisions of the courts of last resort upon this question are not numerous and are not entirely satisfying. Yet they lay down a rule which we think will enable us to arrive at a correct solution of the problem before us. The case bearing most directly upon this question is that of *San Gabriel Valley Country Club* v. *Los Angeles,* 182 Cal. 392, 394, 397 [188 Pac. 554, 555, 9 A. L. R. 1200]. In that case the plaintiff brought suit against the county of Los Angeles to enjoin the flooding of its lands by the waters of Rubio Canyon wash and for damages already caused by such overflow. The decision recites that: "In 1913 the defendant county, through the instrumentality of two so-called protection districts, constructed the drains, two in number, in question here. They really are but a single drain, since the second is but a continuation of the first. They, or rather it, is a concrete box of a capacity to carry all the waters of the Rubio wash, which it picks up by means of an intake dam near the head of the wash and empties into it again about a mile above the plaintiff's land. It follows the general direction of the wash and for some of the distance is laid in it, but for some of the distance departs from it." In determining the legal status of this channel, after the changes therein made by the county, the court continues and says: "We have referred to the Rubio canyon wash and the continuation of it through the plaintiff's land as a natural water channel. In one sense it is not that. It did not exist as a definite watercourse, at least as far as the plaintiff's land, before the region was settled up, but was created as the result of settlement. Nevertheless, it is natural in the sense that it was originally made by the waters themselves and not by man, although it is possible that except for the acts of man the waters would not have been kept together so as to make a channel. In any event, it has now existed for such a length of time as the channel for the natural drainage of the watershed tributary to it, that the manner of its creation is not material, and it has all the attributes of a water channel wholly

natural in origin. (*City of Reading* v. *Althouse,* 93 Pa. St. 400.)''

The doctrine enunciated in *San Gabriel Country Club* v. *Los Angeles, supra,* has been followed by the Supreme Court of Montana in a recent well-considered case, where that court, citing the California case, approved its statement of the law in the following language: ''The main source of supply of all western streams is, primarily, the melting of snow and the fall of rain in our mountains and foothills, collecting each year in their accustomed channels and thence finding their way to the streams; this is a more permanent source than mere surface waters diffused over the land by rains and melting snow. (Farnham on Waters, 1559.) Such waters, thus forming a watercourse and flowing with regularity from year to year, although the channel may be dry for the major portion of each year, are a proper subject of appropriation (*Borman* v. *Blackmon,* 60 Or. 304 [118 Pac. 848]; *Los Angeles Ass'n* v. *Los Angeles,* 103 Cal. 461 [37 Pac. 375]), and where such waters did not originally collect and flow down the channel, if through the instrumentality of man they have been made to do so and, through years of so flowing have acquired a permanent character as the natural drainage of the watershed, the original manner of the creation of the stream is immaterial; it is a 'watercourse' with all the attributes of one wholly natural. (*San Gabriel Valley Country Club* v. *Los Angeles County, supra; City of Reading* v. *Althouse,* 93 Pa. 400.)'' (*Popham* v. *Holloron,* 84 Mont. 442 [275 Pac. 1099, 1102].)

The Supreme Court of Oregon has also approved the same doctrine in the case of *Harrington* v. *Demaris,* 46 Or. 111 [77 Pac. 603, 82 Pac. 14, 1 L. R. A. (N. S.) 756]. In that case the court said: ''The water flowing in the outlet from the swamp northward into the old channel never originally reached Spring branch, but when De Haven, Demaris, and Harris, by a concert of action, took out the dam and let such water, together with that from Spring No. 1, into the branch, they thereby made these springs tributary to such streams, and subject to the rules of law applicable to riparian ownership. (*Cottel* v. *Berry,* 42 Or. 593 [72 Pac. 584].) In that case Mr. Justice Wolverton, in discussing this subject, said: 'It seems to be a rule of law that where owners of different parcels of land conduct water across the same in

an artificial channel, and do not define their respective interests in the water, their reciprocal rights thereto are to be measured and determined as if they were riparian owners upon a natural stream.' In *Burk* v. *Simonson*, 104 Ind. 173 [2 N. E. 309, 3 N. E. 826, 54 Am. Rep. 304], it was held that where a change is made in the flow of a natural watercourse, either artificially or otherwise, and riparian owners acquiesce in the new state of the stream for so long a time that new rights accrue, or may be presumed to have accrued, such acquiescence is binding, and precludes a restoration of the stream and its surroundings to their original condition. In the case at bar, we think the testimony warrants the conclusion that after defendant continued the west ditch north on his premises, so as to conduct the water from Spring No. 1 into the old channel, the riparian proprietors removed a part of the old dam, permitting the water issuing from Dorothy's land to flow down Spring branch, thereby making it tributary thereto and entitling them to a reasonable use thereof.'' That case was later approved by the Supreme Court of that state by a decision in which is found the following statement: ''The opening of these channels was acquiesced in by all on the stream, and since the year 1882 the water has naturally run through them in about the proportion indicated. Having flowed in this manner for more than the period prescribed by the statute of limitations, they have become fixed.'' (*Hough* v. *Porter*, 51 Or. 318 [95 Pac. 732, 98 Pac. 1083, 102 Pac. 728].)

In the state of Washington the same rule is followed by the courts of that state. In *Matheson* v. *Ward*, 24 Wash. 407 [64 Pac. 520, 521, 85 Am. St. Rep. 955], the Supreme Court of that state held as follows: ''Even if the west channel was a natural channel prior to 1865, and was then dammed up, and the water diverted to the East and Hurd's creek channels, where it was confined for thirty years, and this flow was acquiesced in by the riparian owners and others along the channels of said river, this would make the East and Hurd's creek the natural channels; and defendants and others purchasing and improving lands along the old channel, and relying upon the flow continuing in the channels thereby formed, could not have their lands damaged by reason of the water being turned back by artificial means after that lapse of time. After the lapse of thirty years

the channels known as the 'East' and 'Hurd's creek' became natural channels, and the attempt of riparian or other owners to change the flow at this late day to the injury of persons on the old channel would be unlawful. According to the evidence it is probably true that in the year 1865 one Le Balister, by means of a dam or embankment, changed the flow of water out of the West channel. Conceding it to be so, the acquiescence by plaintiffs and their grantors and all riparian owners below the point of divergence for a period of thirty years has now lost them the right to change the flow from the new into the old channel." *Hollett* v. *Davis*, 54 Wash. 326 [103 Pac. 423], announces similar principles.

To the same effect is the decision of the Supreme Court of Iowa, where that court said: "A watercourse is defined as a natural stream of water usually flowing in a definite channel having a bed and sides, or banks, and discharging itself into some other stream or body of water. It is not necessary that its origin be exclusively the work of nature. It may be aided by the hand of man; but if thereafter it becomes a living, flowing stream of water, with all the essential elements of a watercourse, and has remained in such condition for the prescriptive period, then, as to parties through whose lands it runs, and as to their rights, it becomes a watercourse, and their right to divert it or control it, to the prejudice of riparian owners, becomes fixed and settled. It seems in this case a great many years ago the water that flowed in this stream subsequently followed this natural course; that the grantors of the plaintiff and defendant made some slight excavation in the ground tending to facilitate the flow of the water over their lands in this natural course. By the action of nature and the laws of gravitation this water gradually cut a deep and wide channel through the ground, through which the waters had flowed for a great many years, discharging itself into what is known as Indian creek. The original source of the water is not shown in this record; but that they coursed through this channel for more than twenty years prior to the time complained of is shown by the evidence, and therefore, as to these parties, at that time, it was a natural watercourse." (*Falcon* v. *Boyer*, 157 Iowa, 745 [142 N. W. 427, 429].)

We find that text-writers whose works have been accepted as authority upon the subject of water rights are in accord

with the authorities above cited. Speaking of riparian rights in connection with an artificial watercourse, Farnham on Water and Water Rights, volume 3, page 2428, states the rule as follows: ''The question whether or not any riparian rights can attach to an artificial watercourse depends upon its character. If it is nothing more than an artificial watercourse there can be no riparian rights upon it, whereas if it is a substitute for a natural watercourse, so that it can be regarded as a natural watercourse, riparian rights may attach to it.''

In Wiel on Water Rights, volume 1, section 60, that author states the law as follows: ''There is further an established principle that by lapse of time an artificial watercourse may come to be regarded as equivalent to a natural one. These cases do not depend exactly upon prescription, for, as above shown, prescription, properly speaking, cannot run in favor of lower parties upon a flow as against parties higher up. They rest rather upon what some of the cases call ordinary dedication to a class of public which, in the course of time, has established itself upon the basis of the artificial condition. Where the creator of the artificial condition intended it to be *permanent*, and a community of landowners or water users has been allowed to adjust itself to the presence and existence of the artificial watercourse or other artificial condition, acting upon the supposition of its continuance, and this has proceeded for a long time beyond the prescriptive period, the new condition will be regarded as though it were a natural one, its artificial origin being then disregarded by the law as it has been by the community. The creator of the artificial watercourse will be held to have dedicated it to the use of the community that has by long time become adjusted to it.''

Kinney on Irrigation and Water Rights, section 473, pages 803, 804, in a much more extended but no less apt statement, declares the law upon this subject to be as follows: ''As to whether or not any riparian rights can attach to artificial watercourses depends entirely upon their origin and character. If they are clearly artificial channels, such as canals, ditches, conduits or aqueducts, used to convey the water from the stream or other body of water, riparian rights cannot attach. In order to acquire the right to the use of water flowing in artificial channels, they must be

18

based upon other considerations than that of the ownership of the land through which or adjoining which the streams run. It must depend upon some grant or agreement, either proved or presumed, from or with the owner of the ditch, or upon some other legal origin, such, for instance, as prescription. Upon the other hand, however, the authorities hold that a watercourse, although constructed artificially, may have originated under such circumstances as to give rise to all the rights that riparian proprietors have in a natural and permanent stream, or have been so long used as to be deemed by prescription natural watercourses. Such is the case where the whole stream is diverted into the new channel, and thereby the artificial channel is substituted for the natural. Where this is done under such circumstances as to indicate that it is to be permanent, riparian rights may attach to the artificial channel. And it is further held that where the artificial watercourse was not created by joint action of the owners, it may become such a one to which riparian right may attach, if the various owners along its course have always treated it as such.'' In line with the foregoing we cite the following authorities: *Hornor* v. *City of Baxter Springs*, 116 Kan. 288 [226 Pac. 779]; *Ellis* v. *Tone*, 58 Cal. 289; *Paige* v. *Rocky Ford Canal etc. Co.*, 83 Cal. 84 [21 Pac. 1102, 23 Pac. 875]; *Harrington* v. *Demaris*, 46 Or. 111 [77 Pac. 603, 82 Pac. 14, 1 L. R. A. (N. S.) 756]; *Smith* v. *Youmans*, 96 Wis. 103 [70 N. W. 1115, 65 Am. St. Rep. 30, 37 L. R. A. 285]; *Delaney* v. *Boston*, 2 Harr. (Del.) 489; *Shepardson* v. *Perkins*, 58 N. H. 354; *Woodbury* v. *Short*, 17 Vt. 387 [44 Am. Dec. 344]; *Rait* v. *Furrow*, 74 Kan. 101 [85 Pac. 934, 10 Ann. Cas. 1044, 6 L. R. A. (N. S.) 157]; *City of Reading* v. *Althouse*, 93 Pa. St. 400.

From the foregoing authorities we feel warranted in holding that a watercourse, although originally constructed artificially, may from the circumstances under which it originated and by long-continued use and acquiescence by persons interested therein become and be held to be a natural watercourse, and that riparian owners thereon and those affected thereby may have all the rights to the waters therein that they would have in a natural stream or watercourse.

■ Applying these legal principles thus established to the channel now connecting the Kings and San Joaquin Rivers we think that there can be no question that at the time of the trial of this action and for years prior thereto said channel possessed all the attributes of a natural watercourse; that it was a tributary to the San Joaquin River, and that riparian owners on said river had and have all the rights to the waters of said stream as they have in any other tributary of said river naturally flowing into the river above their lands. In the first place, while at its inception Captain Esrey made a cut in the banks of Kings River at the upper end, and Jefferson James at the lower end plowed a furrow connecting Fresno Slough with Fish Slough in the Fresno Swamp, the water diverted through said cut in Kings River and flowing through said cut and the James Furrow soon made for itself a channel through the entire length of Fresno Swamp. The channel extended from Kings River to Fresno Slough, and as early as 1884 it was carrying a substantial part of the water of Kings River and emptying it into San Joaquin River through Fresno Slough, and by 1909, sixteen years before the respondents made any claim to the waters flowing therein, said channel was carrying practically all of the waters of Kings River. From its inception it was regarded as a permanent channel. Instead of any attempt being made to turn back water from the channel into the old bed of Kings River, every effort was made to facilitate the passage of these waters through the channel until 1910, when the present by-pass was begun, and when completed four years later it was of sufficient capacity and stability to transport all of the normal flow of Kings River at the intake of said canal to the north and west, and finally to discharge them into the San Joaquin River.

■ Respondents have cited a number of authorities to the effect that the general rule is that riparian rights exist only in natural watercourses and in waters naturally flowing therein. With this rule we are in accord. We have seen, however, that a channel for the diversion of water may have existed for such a length of time, and may have been used under such circumstances, that the manner of its creation is not material, and it then has all the attributes of a water channel wholly natural in its origin. When such a channel has attained that state it becomes, in legal contem-

plation, a natural watercourse, and lands bordering thereon are riparian thereto in the same manner and to the same extent as are lands bordering on streams natural in their origin.

Respondents cite the following statement from California Jurisprudence: "Riparian rights exist only in natural watercourses and natural bodies of water." (25 Cal. Jur., p. 1097.) In support of this twofold statement the author cites *Green* v. *Carotta*, 72 Cal. 267, 269 [13 Pac. 685], and *Turner* v. *James Canal Co.*, 155 Cal. 82, 87, 88 [99 Pac. 520, 132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401]. The first of these two cases concerns the rights of users of waste waters of a certain ditch, in which it was held that said users acquired no right to said waters by long and continued user. The second of those two cases involved the right of the James Canal Company to waters in Fresno Slough to which the lands of said company were riparian. It was held that the right to use water upon adjoining land applies as well to the waters of a lake, pond, slough or any natural body of water by whatever name it may be called, as to a running stream. It is manifest that neither of these cases has any direct bearing upon the question in which we are now interested.

Wiel on Water Rights, volume 1, section 52, is cited by respondents. In the preceding section of said work the author begins a chapter devoted to a general discussion of the subject of "Natural Watercourses". In section 52 is shown the distinction between natural and artificial watercourses, and that the law applicable to these two separate types of property is entirely different. The author in the succeeding sections of the chapter discusses different phases of the general subject until he comes to section 60, a portion of which we have quoted above. Immediately following our quotation are found these significant words: "Where the owner of the land has artificially changed the course of the stream so as to affect other riparian proprietors favorably, and acquiesced therein for a sufficient length of time, he cannot claim the right to change the flow of the water to the detriment of such other riparian owners; for such acquiescence on his part is binding like a public dedication. After high-water channels are artificially opened, and after they, together with the cuts dug connecting them with the main

stream, have been used by the parties opening them and by their successors in interest, and such use is acquiesced in and recognized as branches of the main creek by others on the main stream and its tributaries and branches for the period prescribed by the statute of limitations, they become as natural channels and owners of land adjacent thereto are in law entitled to the same consideration and to the same rights as are those on the main and unquestioned channel." It would seem that the learned author of this valuable work upon the subject of Water Rights is in thorough accord with the conclusion which we have reached that a water channel, although artificially created, may have existed for such a length of time and used under such circumstances as to attain all the attributes of a natural watercourse.

*E. Clemens Horst Co.* v. *Tarr Min. Co.*, 174 Cal. 430 [163 Pac. 492], is also relied upon by respondents in support of their contention that riparian rights exist only in natural watercourses. In that case the court distinguishes between the natural waters flowing in a stream and waters which had been conducted by the defendants into the stream and carried therein to a point downstream, where they were retaken by said defendants. As to those waters the court held that the defendants could retake them at their pleasure. These waters never became a part of the natural flow of the stream for the reason that the defendants never lost their rights therein, and simply used the channel of the stream to transport them from an upper to a lower point in the stream. The other authorities cited by respondents on this phase of the case have but little direct bearing upon the point now under discussion and may be passed by without further comment.

The case of *E. Clemens Horst Co.* v. *New Blue Point Min. Co.*, 177 Cal. 631 [171 Pac. 417], appears to shed some light upon the question now under consideration. That case, like the case of *E. Clemens Horst Co.* v. *Tarr Min. Co.*, *supra*, involved the waters of Bear River and its tributary Wolf Creek. The facts of that case show that the sewage from the city of Grass Valley, and the water discharged from mines and mills in said city had for some fifty years prior to said action been discharged into Wolf Creek. The water used by the city and by the companies operating said mines and mills was received from a canal which led from

Yuba River to the city of Grass Valley and after its use there by the city and by the mine owners in their mines and mills was discharged into Wolf Creek and through this creek flowed into Bear River. Plaintiffs were riparian owners of land on Bear River, and as such owners claimed these waters to be a part of the stream and subject to riparian ownership. They sought to enjoin the defendants, whose lands were located below the point where said waters were received into Wolf Creek, but above those of the plaintiffs, from diverting the water for use on defendants' land. The court, however, held that although the waters from the city of Grass Valley and the mines had been diverted into Wolf Creek for a long period of time, yet the city and the mine owners might at any time discontinue such diversion, and therefore such waters remained "foreign waters" and never became any part of the natural stream. It was accordingly further held that lower riparian owners on the stream, like the plaintiffs in said action, acquired no title nor gained any right to said waters by their long-continued use thereof nor by the continued diversion thereof into said natural stream by the city of Grass Valley and said mine owners. On page 637 of the opinion the court said: "If, then, the appellant [the plaintiff] can obtain no easement or right by adverse possession or user against the people of Grass Valley who add to the *corpus* of the stream, how, ask respondents, can plaintiff maintain the present action without first establishing a right to the use of this water? We can find no satisfactory answer to this question that will fit with appellant's contentions. Respondents invoke the rule of property that plaintiff must rely upon the strength of its own title and not upon the weakness of that of its adversaries. (Citing *Little Sespe Con. Oil Co.* v. *Bacigalupi*, 167 Cal. 381 [139 Pac. 802].) We see no escape from the logic of the rule so invoked and its application to the conditions here presented for our consideration." There is a marked difference between that case and the present one. There the diversion of the water through long standing might be terminated at any time by those responsible for its diversion. In the present case the diversion is permanent. All the instrumentalities employed to divert the water of Kings River into the San Joaquin River are of a permanent

and lasting character, and no attempt has ever been made, in so far as the record shows, by any of those responsible for the changed condition of said channel, or by any other persons, to restore the former condition, or to interfere with the appellant's use of the water thereby diverted into the San Joaquin River.

The element of permanency as an important feature in the formation of a watercourse of the character of that now under discussion was stressed in the case of *Blackburne* v. *Somers,* 5 Law Reports, Ireland, 1. Although this case was decided by a court of distant jurisdiction, the language there used aptly sets forth the doctrine which we hold to be applicable in the instant case. In that case the court said (page 7) : "I do not think that in this case it makes any substantial difference whether this stream is natural or artificial. It appears to be settled that riparian rights identical with those attaching to natural streams may be acquired by prescription in artificial watercourses of a permanent character. These rights must depend upon the character of the watercourse, and the purposes for which it was constructed. If the watercourse was of a permanent nature, and constructed for lasting purposes, and especially for the general benefit of the parties in its vicinity, and not merely with the temporary and private object of bene-fiting the property of those by whom it was constructed, such as draining a mine, or a mining district, or the like, riparian rights may be acquired in its water, just as in a natural stream. In the case of *Arkwright* v. *Gell* [5 M. & W. 203] (1), where it was held that no right to the con-tinuance of the flow of water in an artificial watercourse could be acquired, as against the persons who constructed it, by mere user for any length of time, the decision was based on the nature of the watercourse, which showed it was of a temporary character, and constructed merely for the convenience of the owners of certain mines for the purpose of drainage. In *Mager* v. *Chadwick* [11 A. & E. 571] (2), where it was sought to set aside a verdict for the plaintiff, on the ground of misdirection in telling the jury that the law of watercourses is the same whether natural or arti-ficial, the Court of Queen's Bench refused the application. Lord Denman, in delivering the judgment of the court, said : 'We think this was no misdirection, but clearly right.

The contrary proposition, that a water course of whatever antiquity, and in whatever degree enjoyed by numerous persons, cannot be so enjoyed as to confer a right to the use of the water if proved to have been originally artificial, seems to us quite indefensible.' '' Continuing, the court further said (page 11): ''From a long time beyond the memory of living man, it appears to have flowed in its present channel, and that channel, so far as it is artificial, bears all the appearances of having been constructed for permanent use. It has not been suggested that there was any temporary purpose for which this watercourse could have been formed, or that there was any person who formed it for private use. I am, therefore, of opinion that if this be an artificial watercourse, it is one of that permanent nature that riparian rights in its waters could have been called into existence of the same nature as those attaching to a natural stream. No right to divert . . . it could be acquired except by grant, actual or presumed, or by prescription.''

 Respondents concede that the land owners along the channel between Kings River and Fresno Slough are estopped from claiming that the artificial channel connecting the two rivers is not a natural channel. In their brief they make this significant admission: ''In this case [*Paige* v. *Rocky Ford Canal etc. Co.*, 83 Cal. 84, 21 Pac. 1102, 23 Pac. 875] the court expressly said that the doctrine that an artificial watercourse may under some circumstances and as to some persons, be treated as of natural origin was not applicable to the facts in that case. What was there said of the doctrine was, therefore, *dictum*. However, we readily acquiesce in the doctrine as stated by the court in that case. That is to say, we cheerfully concede that the person who changes the course of a stream on his own land may be estopped to claim that the artificial character so brought about by him is not a natural one.'' In this connection we think the language used in *Paige* v. *Rocky Ford Canal etc. Co.*, 83 Cal. 84, 93 [21 Pac. 1102, 1104, 23 Pac. 875], well expresses the legal relations of the parties in such a situation, where the court said: ''In the case of riparian owners the rule has been held to be that 'when a stream flowing through a person's land is diverted into a new channel, either artificially or by

a sudden flow affecting the rights of other riparian proprietors favorably, and the owner acquiesces in the new state of the stream for so long a time that new rights accrue, or may be presumed to have accrued, such acquiescence is binding like a public dedication, and the stream cannot be lawfully turned [returned] to its former channel.' (Gould on Waters, sec. 159; *Woodbury* v. *Short,* 17 Vt. 386 [44 Am. Dec. 344].) So, where the owner of the land has changed the course of the stream so as to affect other riparian proprietors favorably, and acquiesces therein for a sufficient length of time, he cannot claim the right to change the flow of the water to the detriment of such other riparian owners. (*Ford* v. *Whitlock,* 27 Vt. 265.)'' If, therefore, in any case a person changing the course of a stream may be estopped from claiming that the new channel is not a natural channel, and respondents concede that there are such cases, then we think the facts before us clearly present such a case. We have already given the reason for our conclusion—the permanent nature of the new channel, the long uninterrupted use thereof as a natural channel and the complete and consistent acquiescence in such use by all those through whose lands said channel runs or who were instrumental in its construction. Respondents, however, take the position that the rights of the riparian owners to the waters of Kings River above the north fork of Kings River cannot in any way be lost or in the least manner affected by any action taken by lower riparian owners, and that therefore the appellant, as against said upper riparian owners, cannot acquire any rights to the waters of Kings River by the creation of said new channel, or by any other act done or performed by a lower riparian owner or lower appropriator. Conceding this to be true, we cannot see how the respondents are aided by such a situation. They have nothing in common with the upstream riparian owners. It is not necessary for us to decide any controversy between these owners and the appellant, for the reason that no such controversy is before us. Respondents are not riparian owners and they have no riparian rights. If the owners of lands along the new channel, as against the lower riparian owners, are estopped from claiming that said channel is not a natural one, we cannot see that the respondents are in any better position.

Respondents are at best but subsequent appropriators on the stream and as against them the lower riparian owners, at least to the extent of their needs, are entitled to the entire natural flow of the stream. (*Southern California Inv. Co.* v. *Wilshire,* 144 Cal. 68, 73 [77 Pac. 767]; *Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 327, 333 [88 Pac. 978, 11 L. R. A. (N. S.) 1062]; *Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391]; *Herminghaus* v. *Southern California Edison Co.,* 200 Cal. 81 [252 Pac. 607]; *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772].)

We conclude, therefore, upon this phase of the case that the channel now connecting Kings River with Fresno Slough has all the attributes of a natural channel, and for the purpose of determining the respective rights of the parties hereto to the waters flowing therein, said channel must be regarded and treated as a natural channel. As so regarded, there thus exists a natural channel through which the waters of Kings River flow from their source into San Joaquin River, where they are mingled with the waters of the last-named river, and from that point on the united waters of the two rivers flow on and through the lands of the appellant. Accordingly, the appellant as the owner of lands riparian to the San Joaquin river has all the rights in and to the waters thereof, after being thus augmented, that any riparian owner has in and to the waters of a stream to which his land is by nature riparian.

As we have already indicated, a third question is presented by the record on appeal in this action, and that is the question of the existence of unusual, unexpected and extraordinary waters in Kings River to which the riparian rights of the plaintiff do not attach. The trial court found: "That in the course of the flow of Kings river, season by season, and according to the historical discharge of the stream, there are occasional times when there are flows of water in the stream that are unusual, unexpected and extraordinary; that such flows are those flows that occur either in considerable quantities at unusual, unexpected and extraordinary times, or at unusual, unexpected and extraordinary rates of flow, or for an unusual, unexpected and extraordinary duration of time; that by the historical performance of the stream the flows of water therein have

been and will be unusual, unexpected and extraordinary at all times when at Piedra, where the stream debouches from the mountains, there has been or shall be discharges exceeding and to the extent that they exceed (a) 4000 cubic feet per second in the months of August to March, inclusive, for any period of flow; (b) 14,000 cubic feet per second in the months of April to July, inclusive, for any period of flow; (e) 12,000 cubic feet per second for any period of time beyond ten (10) consecutive days at any time.''

Appellant questions the sufficiency of the evidence to sustain this finding. The evidence on this phase of the case shows that there are periods of excessive high water in Kings River, during which time large volumes of water flow down the channel of the river, filling the same to its exterior banks, and in the early days, as noted above, during these periods of high water, the water from the river would flow down to Tulare Lake and into Summit Lake and Fresno Swamp. Since the construction of the north fork of the Zalda Canal, and the construction of the by-pass, these waters have flowed through said.new channel to Fresno Slough and thence into the San Joaquin River. These large accretions' in the stream, as we have seen, were either caused by heavy rains or from the melting of the snow at the source of said river. In this respect Kings River differs in no respect from the San Joaquin River and other streams in the same vicinity, including those tributary to the San Joaquin River. That this is true is shown by a comparison of the evidence in this case with that in other cases before this court in which the question of unusual, extraordinary and unexpected waters in such streams was in issue. In fact, as far as the similarity of Kings River and San Joaquin River in this respect is concerned, the respondents have expressly admitted that fact. In their brief, referring to Kings River and San Joaquin River, they state: ''Peak flows in the two rivers are substantially synchronous. They are occasioned by the same phenomena. When Kings river waters are overflowing the by-pass, the San Joaquin river waters which are native to the stream and naturally flow therein from its source to its junction with the Sacramento river are flooding and inundating plaintiff's lands.''

In the case of *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607, 610], this court had occasion to consider the rights of the parties thereto to the waters of the San Joaquin River, and the question arose in that case whether certain waters flowing therein during the season of extreme high water were a part of the stream to which the rights of a riparian owner attached, or were unusual, extraordinary and unexpected. In the determination of that question this court said:

"The trial court found upon sufficient evidence, which was not materially conflicting, that the San Joaquin river was a natural stream of water with well-defined channels and banks which, with its tributaries, took its rise in the Sierra Nevada mountains and descended thence in a general westerly course to the plains of the San Joaquin valley, and thence in a general northwesterly direction through the counties of Madera, Fresno, Merced, Stanislaus and San Joaquin to the San Francisco bay; that the said river in its usual, ordinary and natural flow passed along and over the lands of the plaintiffs herein; that the natural flow of water in the said San Joaquin river is, and has always been and always will be, if unobstructed, variable in quantity in the course of each and every year; that is to say, the same is, has been and will be largest and most abundant at times of heavy rainfall over its watershed in said mountains in each winter season, and will also have a larger accretion in the spring and summer season by reason of the melting of the snows in said mountains; that these annually occurring accretions in the amount and flow of the waters of said river are natural and regular, and occur in their usual, expected and accustomed seasons and result in an increased amount and flow of the waters of said river as they proceed by, along and across the lands of said plaintiffs, lasting through several months in the annual change of seasons of every year. From these findings of fact based upon evidence which is indisputable the conclusion is inevitable that the waters of the San Joaquin river annually flowing therein before and during and after these regularly occurring accretions in the volume thereof constitute the usual and ordinary flow of said river and are in no sense 'storm' or 'flood' or 'vagrant' or 'enemy' waters as these terms are understood in law. This has in fact been so

definitely determined by the decisions of this and other courts having precise reference to the waters of this and of other similar streams taking their sources in the same range of mountains and owing their periodical accretions to the same general causes, as to be no longer a matter susceptible of serious dispute. In the case of *Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], this court was called upon to determine the nature of the annual flow of the waters of the Fresno and also of the San Joaquin rivers, which streams take their rise in the same general region and are subject to the same periodic and climatic conditions. It was in that case contended by the defendant that the waters it proposed to divert did not constitute any part of the ordinary or usual flow of those rivers, but were waters occurring during periods of heavy rains and were storm, freshet and flood waters as distinguished from the ordinary and usual flow of said rivers, and that as such the defendant was entitled to impound, divert and use the same. On the other hand, it was claimed by the plaintiff that the rise in the flow of the waters in said rivers was not extraordinary, occurring upon rare occasions, but that such flow and overflow occurred in all years of ordinary rain and snowfall and constituted the regular annual and usual flow of said rivers. The trial court found in that case, as in this case, that the claim of the plaintiff relative to such waters was correct, and this court in sustaining such finding and conclusion used the following language:

" 'Upon this showing it cannot be said that a flow of water, occurring as these waters are shown to occur, constitutes an extraordinary and unusual flow. In fact, their occurrence is usual and ordinary. It appears that they occur practically every year and are reasonably expected to do so, and an extraordinary condition of the seasons is presented when they do not occur; they are practically of annual occurrence and last for several months. They are not waters gathered into the stream as the result of occasional and unusual freshets, but are waters which on account of climatic conditions prevailing in the region where the Fresno river has its source are usually expected to occur, do occur, and only failed to do so when ordinary

climatic conditions are extraordinary—when a season of drouth prevails.'

"Again the court says:

" 'This is the character of the waters of the Fresno river, the flow of which it is shown the defendant intends to divert. These overflow waters, occasioned through such usually recurring floods and freshets, are not waters which flow beyond the natural channel boundaries of the stream which nature has designed to confine their flow; they are not waters which depart from the stream or are lost or wasted; they flow in a well-defined channel in a continuous body and in a definite course to the San Joaquin river, and while they spread over the bottom lands, or low places bordering on the main channel of the Fresno river as it carries its stream during the dry season, still this is the usual, ordinary, and natural channel in which they flow at all periods of overflow, the waters receding to the main channel as the overflow ceases.'

"And finally the court concluded:

" 'In the present case the storm and freshet waters are not something distinct and separate from the ordinary waters of the Fresno river. As a fact, and under the authorities, being annually recurring floods and freshets flowing in a clearly defined channel, they constitute a part of the ordinary flow of the waters of such river.'

"In the case of *Piper* v. *Hawley,* 179 Cal. 10, 17 [175 Pac. 417], this court expressly approved the doctrine laid down in the foregoing case to the effect that annually recurring floods, even though the flow of their waters made the stream wider during the period thereof so as to include adjoining lands, are yet to be deemed a part of the ordinary flow of the stream. In the case of *California Pastoral etc. Co.* v. *Enterprise C. & C. Co.,* 127 Fed. 741, the Circuit Court of the United States, sitting in and for the Southern District of California, and having under consideration a case wherein the particular lands affected by the present controversy and the riparian rights of the owners and occupants thereof in relation to the San Joaquin river were involved, decided that the waters of the San Joaquin river which the defendant in that case was proposing by means of a canal and dam to divert from their accustomed flow in said river along and over the Herminghaus lands were

not storm or freshet waters which any person who can may impound and use, but that such waters constituted the usual and ordinary flow of said river in which the full riparian rights of the owners of said lands inhered. In the case of *Lindblom* v. *Round Valley Water Co.*, 178 Cal. 450 [173 Pac. 994], this court said with relation to the facts of said case: 'The evidence is clear to the effect that the water running into Round valley (and, except as interrupted by the defendant down North canyon) consisted of the runoff from the usual and annually recurring fall of rain and snow. Such water, when running in a defined stream, constitutes a watercourse to which the riparian proprietor's rights attach.' (Citing *Miller & Lux* v. *Madera etc. Co., supra.*)

"In the presence of the foregoing consistent rulings of this court and of the federal court having reference to the precise or similar conditions relative to the annual, usual, ordinary, and regularly recurring outflow of the San Joaquin river during the varying seasons of each and every year we are constrained to hold that in so far as the lands of said plaintiffs shall be found to be riparian to said river they are entitled to the exercise and enjoyment of whatever riparian rights they shall be determined to be invested with, in the entire flow of the waters of said river considering the same with its seasonal accretions as the usual and ordinary flow of said stream during each and every year."

Similar holdings have been made by this court regarding other streams situated in the same vicinity. The Herminghaus case referred to and quoted from the case of *Miller & Lux* v. *Madera Canal etc. Co., supra,* in which this court had under consideration the character of the waters of Fresno River situated only a short distance to the north of San Joaquin River. This river has its source in the Sierra Nevada Mountains, like Kings River, and flows in a westerly direction parallel to the San Joaquin River before the last-named river makes an abrupt turn to the north, as hereinbefore stated. It empties into the San Joaquin River a few miles north of the junction of Fresno Slough with San Joaquin River. It is not necessary for us to repeat all that this court stated regarding the waters of this river, as such statement appears in detail in the above quotation from the Herminghaus case. We will, however, repeat the

conclusion rendered by the court in that case, which is as follows: "In the present case the storm and freshet waters are not something distinct and separate from the ordinary waters of the Fresno river. As a fact, and under the authorities, being annually recurring floods and freshets, flowing in a clearly defined channel, they constitute a part of the ordinary flow of the waters of such river."

Kern River, situated some miles southerly of Kings River and having its source in the same mountain range, is similar in character to Kings River. It receives its waters from rains during the winter season and from melting snow during the spring and summer. The question arose in the case of *Lux* v. *Haggin,* 69 Cal. 255 [4 Pac. 919, 10 Pac. 674], whether during seasons of high water there was any unusual, extraordinary and unexpected waters in said river. The effect of said decision was that all such waters which were the result of heavy rain or melting snow were a part of the ordinary flow of said stream.

Merced River to the north of Fresno River, which rises in the Sierra Nevada Mountains and flows westerly and empties into the San Joaquin River, is also similar in character to the Fresno, San Joaquin and Kings Rivers. In the recent case of *Collier* v. *Merced Irr. Dist.,* 213 Cal. 554, 558 [2 Pac. (2d) 790, 791], we held, referring to the Merced River: "Like many other California streams, the run-off of said river varies widely during the different periods of the year and likewise varies widely from year to year. In some seasons it has been known to carry a flow of as much as 3700 cubic feet per second; at other times it has been known to be as low as 25 cubic feet per second. The average run-off is 1,069,000 acre feet per annum. There are, however, periods of high flow in every year, occurring between the months of April and October, inclusive. They are due in part to rainfall, but more properly to the melting snows in the upper reaches of the stream in the said mountains. These periods of flood are usual and ordinary and constitute a part of the normal flow of the stream. There are in the stream no extraordinary flood, storm or unusual freshet waters, but all of the water therein is properly classified as part of the usual and normal flow thereof."

It will thus be seen that whenever the question of unusual, extraordinary and unexpected waters in the streams located in the vicinity of Kings River has arisen, and which streams are practically identical in character, in so far as the source from which they receive their waters is concerned, this court has invariably and consistently held that waters flowing during periods of high water were a part of the natural flow of the stream and could not be classed as either unusual, extraordinary or unexpected. Respondents apparently admit the truth of the statement last made, as they set forth in their brief that "until the trial of the instant case, and the companion cases tried in Fresno county, no litigant, so far as we are aware, ever has attempted to allege and prove the existence of any unusual, extraordinary and unexpected flood waters in either the San Joaquin river or the Kings river". We can hardly agree with this statement. Certainly that issue was before this court in the Herminghaus case, regarding the waters of the San Joaquin River, as appears from the excerpt from the opinion in that case which we have quoted above. The same may be said regarding the other cases cited on this subject. But waiving for the present the claim that until the trial of this and its companion cases no litigant has attempted to prove the existence of unexpected and unusual waters in these and other rivers in this same locality, let us examine the evidence of the respondents which they claim shows that there are times when there are unusual, extraordinary and unexpected waters flowing in Kings River. Respondents' witness Charles L. Kaupke gave the testimony upon which they rely to support the finding of the court relating to the existence of unusual, extraordinary and unexpected waters in Kings River. This witness testified:

"Mr. Hadsell. Q. Now, will you briefly describe the usual flow of Kings river the year around, just in a general way. A. Well, starting in the beginning of the year— January, unless there is a heavy storm, the river runs only a few hundred feet per second. A good part of the time under 500, and sometimes getting as low as 200 or 175—in January; a somewhat higher discharge in February; a little higher in March; reaching the highest flow in May and June. The peak may come some years in one month, and

some in the other, and as a rule we expect twelve or fourteen thousand feet. Then it begins to decline, going down as low as 150 to 200 feet before the end of August, and that is about the flow until the first of the year with the exception of the occasional fluctuation of flow due to rainstorms."

This witness continued his testimony as follows:

"Q. Now, you spoke of peak flows in one month or another; what months did you mean by that? A. It will occur in either May or June. That has been the experience during the past thirty years. In a year of more than normal flow the peak as a rule will occur in June, whereas, if it is somewhat subnormal it will occur earlier, coming in May. Q. Where did you determine these quantities? A. At Piedra. Q. At Piedra above the diversions of the river? A. Yes, it is. It is in the low foothills about 26 miles east of Fresno."

The witness was then asked regarding the historical performance of Kings River, and in answer to the inquiry gave a tabulation of the record of the United States Geological Survey made at Piedra and covering a period of thirty years, beginning with the year 1896 and ending with the year 1925. The witness took the average annual flow of the river during these years and then gave the percentage of this average flow for each of these years. The tabulation showed that in ten of these thirty years the flow of the river was above the annual average flow, and during the balance of said years the flow was below said average annual flow. The most that can be said of this evidence regarding the historical performance of said river is that it shows an excess flow of water therein over the average flow during ten years occurring irregularly over a period of thirty years. During the balance of said years the flow was below the average. But is the existence of water in those several years in excess of the average flow of said river any evidence that such excess water is unusual, extraordinary and unexpected? We confess that we can see but little connection between the two. ▇ It is a common occurrence, of which we think this court may take judicial notice, that a dry year, or a series of dry years, is usually followed by one or more wet years. In fact the tabulation prepared by Mr. Kaupke shows just this condition regarding the waters of Kings River. In one instance only, and that was

during the two years of 1906 and 1907, was the percentage of two consecutive years shown to be above the average. In 1906 the percentage was 206 and in 1907 it was 144. But this period was preceded by a dry year, as the tabulation shows that in 1905 the percentage of flow in the river was 68 and it was followed by a still dryer year when the percentage fell to 54. We know of no rule of law that will permit us to hold that water flowing in a stream to the extent that it exceeds the average seasonal flow thereof is unusual, extraordinary or unexpected. The average seasonal flow is, in our opinion, a false quantity in determining the question of the existence of unusual, extraordinary and unexpected water in a stream. We think the witness Kaupke in that part of his testimony, which we have quoted verbatim above, set forth the true situation regarding the waters of Kings River. ▮ Beginning with the first of the year, January, the flow in the river is small. It then gradually increases until the month of May or June, when the peak of the flow is reached. Thereafter the waters subside until the summer flow occurs just before the winter rains begin. This is the usual, regular and common performance of the river. During seasons of heavy rains, and more particularly when the melting of the snow in the Sierra Nevada Mountains is at its height, large volumes of water are flowing in Kings River. That portion thereof which reaches the intake of north fork, or the Zalda Canal, has, as we have already noted, been carried northwesterly to the Fresno Slough and thence into the San Joaquin River. The quotation which we have hereinbefore set forth from the Herminghaus case, accurately describes waters of this character, and that case holds that such waters "constitute the usual and ordinary flow of said river". To the same effect is the decision of this court in *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59, 76, *supra,* where it was held that, "Upon this showing it cannot be said that a flow of water, occurring as these waters are shown to occur, constitutes an extraordinary and unusual flow. In fact, their occurrence is usual and ordinary. It appears that they occur practically every year and are reasonably expected to do so, and an extraordinary condition of the season is presented when they do not occur; they are practically of annual occurrence and last for several months. They are

not waters gathered into the stream as the result of occasional and unusual freshets, but are waters which on account of climatic conditions prevailing in the region where the Fresno River has its source are usually expected to occur, do occur, and only fail to do so when ordinary climatic conditions are extraordinary—when a season of drouth prevails.'' Such waters of the character above described are frequently referred to as storm or flood waters. They are nevertheless a part of the regular flow of the stream and are not subject to appropriation as against riparian owners on the stream so long as they are or can be put to a beneficial use by said riparian owners. As to the use to which the waters which flow from Kings River into San Joaquin River are being put by the plaintiff the court found as follows: ''That waters of Kings river that have found their way, as herein described, into San Joaquin river have necessarily commingled with the waters of said river, and by reason of said commingling, and not otherwise, have been beneficially used by plaintiff and its predecessors in interest to assist in irrigating the lands described in plaintiff's complaint, but that neither the plaintiff herein nor any of its predecessors in interest, either before or after the bringing about of said or any of said artificial changes, ever solely relied, or now solely rely, upon the flow of any water from Kings river to the San Joaquin river.''

It will thus be seen that the court found that the plaintiff and its predecessors have been, and that plaintiff is now, putting the waters of Kings River, which flow in the San Joaquin River, to a beneficial use. This fact differentiates this case from the case of *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405 [126 Pac. 864, 866, Ann. Cas. 1914A, 74], and kindred cases cited by respondents in support of their contention that they have the right to divert said waters as appropriators because they are flood or storm waters of the stream. In the Gallatin case the plaintiffs were riparian owners on the stream. The defendant, Corning Irrigation Company, threatened to divert flood waters flowing in the stream above the lands of the plaintiff and to convey said waters out of and beyond the watershed of said stream. The trial court in that case found that the diversion of the quantity of such unusual flood waters during certain months of the year when the defendant proposed to make such

diversion would not in any wise damage the plaintiffs. This was tantamount to a finding that plaintiff could not put said waters to a beneficial use. This court held that: "These facts present the question whether or not the flood waters, of the character proposed to be diverted from South Elder creek by the company, may lawfully be taken from the stream for use upon nonriparian lands outside of the watershed of the stream, without the consent of the riparian owners and without compensating them therefor. In other words, whether the right to have such flood waters flow down the stream in its usual course, under the circumstances here disclosed, is one of the riparian rights attached to lands abutting upon the stream, as parcel thereof, which the owner of such lands may enforce against one who proposes to divert the same to nonriparian lands, where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion." The Gallatin case was followed in the recent case of *Gin Chow* v. *City of Santa Barbara et al.*, 217 Cal. 673 [22 Pac. (2d) 5]. In that case the court found that certain flood waters which the defendants threatened to divert from the stream above the riparian lands of the plaintiff could not be put to any beneficial use by the lower riparian owners, and for that reason refused to enjoin their diversion by the defendants.

Where, however, the waters of a stream, although they may be classed as storm or flood waters, are put to a beneficial use by a riparian owner, they cannot be diverted by an upper appropriator to the detriment of said riparian owner. (*Miller & Lux* v. *Enterprise Co.*, 145 Cal. 652 [79 Pac. 439]; *Miller & Lux* v. *Madera Canal etc. Co. et al., supra; Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772].)

These three cases just cited are distinguished from the Gallatin case, in the opinion of the court in that case, where it is stated (page 411) that "The question is not entirely new in this state. In *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], and *Miller & Lux* v. *Enterprise Co.*, 145 Cal. 652 [79 Pac. 439], the question of the right to

divert flood waters was considered in cases where the trial court had decided that they formed a part of the regularly recurring flow of the stream during a considerable period of each season, or where it appeared that such flood waters were necessary to supply the gravel strata and artesian basins under the land of a valley, from which water was obtained to supply the overlying lands. These cases are not parallel to the case at bar.''

The doctrine enunciated in the cases of *Miller* v. *Bay Cities Water Co., supra, Miller & Lux* v. *Madera Canal etc. Co., supra,* and *Miller & Lux* v. *Enterprise Co., supra,* has never been abrogated or even modified by any later decision or ruling of this court, and they must be accepted as enunciating the controlling principle of law applicable to the appropriation of storm waters by an upper appropriator when such waters are being put to a beneficial use by a lower riparian proprietor. ▮ A consideration of the authorities upon this subject leads to the conclusion that flood waters in a stream which can be put to a reasonably beneficial use by riparian owners on the stream are not subject to appropriation by an upstream claimant. On the other hand, if these flood waters are not being used by riparian owners and cannot be put to any beneficial use by them, then, under the doctrine of the Gallatin and Gin Chow cases, they are, to the extent that the riparian owners cannot put them to any beneficial use, subject to appropriation. Under this doctrine it must be held in the instant case that the respondents are illegally invading the rights of the appellant when they threaten to appropriate and divert the storm waters flowing in the north fork of Kings River, a tributary of the San Joaquin River, which said storm waters are being beneficially used by the appellant on lands riparian to the San Joaquin River. The conclusion of the trial court, and its judgment to the contrary, are therefore erroneous and prejudicial to the rights of appellant.

▮ Respondents, however, contend that the trial court in finding XIII, quoted above, wherein it found ''that the waters of Kings river that have found their way . . . into the San Joaquin river . . . had been beneficially used by the appellant,'' was dealing with and referring to the usual and ordinary flood waters in the Kings River, and not to the unusual, extraordinary and unexpected flood waters

flowing in said river. As we have already held that there are no waters of this latter description in said river, the contention of respondents must fall. But even if we were to concede that there existed unusual, extraordinary and unexpected waters in said river, we are unable to agree with the claim of respondents, as to the limitation they contend should be placed upon finding XIII. Its language is clear and distinct and its meaning, in our opinion, is unambiguous. It is not necessary to resort to the pleadings in order to determine its meaning. Respondents do not indicate any particular part of the pleadings upon which they rely and we have not been able to find anything in the pleadings which furnishes support for their present contention.

Respondents further contend that they are entitled to appropriate and divert from King's River at least so much of the flood waters thereof as are not carried by the by-pass between the north fork and Fresno Slough. The capacity of this by-pass is from 5,000 to 5,500 cubic feet per second. Respondents call attention to the finding of the court (finding X) to the effect that the flow of Kings River at Piedra during certain periods of the year greatly exceeds the capacity of said by-pass, and that at least, to the extent of said excess, they are entitled to appropriate the same for the reason that this excess never reaches the lands of the appellant and therefore is not, and cannot be, put to any beneficial use by appellant. By finding X the trial court found that the flow of the water in Kings River has been and will be unusual, extraordinary and unexpected when at Piedra there has been and will be discharges exceeding, and to the extent that they exceed, ''(a) 4000 cubic feet per second in the months of August to March, inclusive, for any period of flow; (b) 14,000 cubic feet per second in the months of April to July, inclusive, for any period of flow; (c) 12,000 cubic feet per second for any period of time beyond ten (10) consecutive days at any time.'' From the foregoing facts the respondents argue that ''The by-pass above the head of Fresno slough was constructed to take care of 5000 cubic feet of water per second. All flows above that amount will overflow and inundate the countryside. The capacity of the by-pass, therefore, affords a good index whereby to determine what are the usual, expected and normal floods, and what are the unusual, extraordinary

and unexpected floods.'' There would be considerable merit in respondents' argument if the trial court had found the amount of water flowing in north fork at the intake of the by-pass, instead of at Piedra, and that would be so whether we held said excess waters to be unusual and unexpected waters or simply storm or flood waters. As these excess waters would never reach the lands of the appellant, and therefore had not been, and could not be, put to any beneficial use by the appellant it could not complain of their diversion by the respondents. (*Gallatin* v. *Corning Irr. Co., supra.*) But the court did not adopt the intake of the by-pass as the point at which the flow of the water of Kings River might be measured for the purpose of determining whether there was any storm or excess water flowing therein. On the other hand, the point designated for that purpose was Piedra, where the stream debouches from the mountains. The evidence does not disclose the exact distance from Piedra to the intake of the by-pass. It does show, however, that Piedra is twenty-six miles northeasterly from Fresno City. From maps and other data in the record it would appear that Piedra is from forty to fifty miles northeasterly from the intake of the by-pass. Between these two points is a large district of farming country dependent entirely upon the waters of Kings River for irrigation, domestic and other purposes. There is evidence in the record that nearly 10,000 second-feet of water are diverted from Kings River by the land owners and residents along the Kings River and above the intake of the by-pass. There is therefore no certainty as to the amount of water which at any time reaches the by-pass, and no finding whatever that any water of Kings River ever reaches the intake of the by-pass, in excess of its carrying capacity. Under this state of the record it is manifest that the capacity of the by-pass is not in any way determinative of any of the rights of the parties in this litigation.

For the reasons heretofore given the judgment is reversed.

Preston, J., Waste, C. J., Tyler, J., *pro tem.*, Shenk, J., Langdon, J., and Seawell, J., concurred.

Rehearing denied.